**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 22, 2010

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 137251

JASON MICHAEL GURSKY,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

YOUNG, J.

Defendant was charged with and convicted of four counts of first-degree criminal sexual conduct for sexually abusing his girlfriend's child. At trial, the child's hearsay statements to a third party were admitted over defendant's objection. Those statements, which were made when the child first revealed the allegations of abuse, contained all the details of the alleged assaults and were used at trial to corroborate the child's testimony. Defendant appealed, arguing that the statements should not have been admitted because they were not spontaneously given as required by Michigan Rule of Evidence 803A.

We agree that the child's statements were not "spontaneous" and therefore hold that the statements should not have been admitted under the limited "tender years" hearsay exception created by MRE 803A. We nevertheless affirm defendant's convictions because the improper admission of the hearsay statements was harmless error. The error is not so prejudicial as to require reversal because the hearsay statements were not used substantively at trial to prove guilt (but rather only to show consistency in the child's testimony), the statements were cumulative to the victim's testimony at trial, and there was other corroborating evidence of defendant's guilt.

Accordingly, we affirm the judgment of the Court of Appeals, but do so on alternative grounds.

## I. FACTS AND PROCEDURAL HISTORY

Defendant Jason Gursky was tried on and convicted of four counts of criminal sexual conduct in the first degree (CSC-I) for sexual penetration of a person under the age of 13.[1] The victim in this case, GA, was the daughter of Gursky's girlfriend, Lori.[2]

The charges against Gursky arose out of two alleged incidents of sexual contact with GA: one in September 2005, when GA was six, and the second around April 30,

---

[1] MCL 750.520b(1)(a) ("A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if . . . [t]hat other person is under 13 years of age.").

[2] I refer to the complainant by her initials and her mother simply as "Lori" in order to protect their identities.

2006, when GA was seven. On May 4, 2006, during a visit to the home of Stacy Morgan, a close friend of Lori, GA first alleged that Gursky had improperly touched her.

The focus of this appeal is the proper characterization of GA's statements when she first discussed the sexual abuse. Those statements are thus provided here in detail, as relayed by Morgan during her testimony at Gursky's trial.

Lori arrived at Morgan's home about 8:00 p.m. after picking her children up from their father's home. Morgan, acting on a suspicion that "something had been going on" with Gursky,[3] asked GA "*if anyone had been touching her.*" GA did not verbally respond, but "*got a horrified look on her face,*" and her eyes welled up. Morgan summoned GA to come closer and talk with Morgan and Lori, which she did and orally responded "*What do you mean?*" Morgan answered: "*Has anyone ever touched your private parts?*" GA's eyes welled up again, she started to suck her thumb, and she responded that somebody had. Morgan followed up: "*Where have you been touched? Who touched you?*" and then listed "*people's names, every man's name that could come to mind, the last of which was Jason [Gursky].*"[4] At the mention of defendant's name, GA began "*bawling, [and] gasping for breath,*" pointed to her vaginal area, and indicated that defendant had touched her "*down there.*" Morgan continued questioning GA: "*How*

---

[3] Earlier in the day Morgan and Lori had a private conversation wherein Lori mentioned "a situation that had happened prior" involving defendant and GA. Apparently this is what stirred Morgan to ask GA if anyone had been touching her.

[4] Morgan was also asked if there were different reactions by GA when the names of the men were mentioned; she answered: "Each one, she just told me no, no, no, and as soon as Jason's name was mentioned, she welled up and said he did it."

3

*did he touch you? What did he touch you with?*" GA responded: "*With his finger.*" Morgan asked: "*Did he touch you any other way? Did he touch you with his penis?*" And GA responded that he had not. Morgan asked: "*Did he ever touch you any other way?*" and GA responded that "*he kissed me with his tongue.*" Morgan followed up: "*On your mouth?*" GA responded: "*No, down here*" and again pointed to her vaginal area.

Morgan noted that GA was "*kind of hesitant*" so she hugged GA and said to her, "*Miss Stacy is your safe person. You know, tell me and I'll make sure it doesn't happen again.*" She gave GA time to calm down, during which time Lori left the room to call Gursky. Morgan then asked how many times the alleged abuse had happened. GA "*kind of looked in the sky*" and responded "*I think it was four times because the first time was when we lived at Miss Tracy's basement.*" Later Lori confronted Gursky, who denied touching GA; when Lori brought GA into the room with Gursky, GA again began to cry but did not make any further accusations against Gursky. A few days later, GA wondered aloud to her mother, "*what if it was a bad dream?*"[5]

---

[5] Lori's testimony concerning the circumstances surrounding GA's statement was largely consistent with that of Stacy Morgan. Lori testified that she believed something was wrong before she and GA arrived at Morgan's house because GA was acting "a little different." Once Lori and her children arrived at Morgan's house, the children were running around, but "Stacy wanted me to have [GA] sit on my lap and ask her some questions, and I did, I asked [GA] some questions, and that's when I learned of—." Counsel did not allow her to finish, but asked what GA's reaction was after the first question. Lori testified that GA started to cry, noting that GA hesitated for "quite a while" before she began to talk, and that she had a four to five minute conversation with GA. She stated that Morgan was present but she did not say whether Morgan asked any of the questions.

4

The following day Lori went to the police and prepared a written statement describing GA's allegations. A detective subsequently asked Gursky to come to the police station, where he questioned Gursky for approximately two hours. Gursky answered all the detective's questions, denied the accusations, and never requested a lawyer. During these interviews, the detective noted that Gursky's fingernails were "jagged."

That same day GA was examined by a nurse, which is common when a sexual assault is believed to have happened within the prior 96 hours. GA complained to the nurse of experiencing pain in her vaginal area since "Jason put his finger in my pee-pee." GA told the nurse that defendant had kissed and touched her "where her pee-pee comes out from." During the examination, the nurse noted that GA had an abrasion on her labia minora, which appeared to have occurred within the last 24 to 48 hours, but could have occurred earlier. The nurse later testified that the abrasion was "consistent" with a fingernail scratch, or could have resulted from innocent behavior. Other than the scratch, the nurse found no other trauma to GA.

Defendant was charged with four counts of CSC-I. Pursuant to MRE 803A, the prosecution provided notice that it would call Stacy Morgan to testify regarding what GA

When asked whom she first told about the abuse, GA testified, "[m]y mom." When the prosecutor asked whether anyone else was there, GA said "Her friend," "Miss Stacy." When asked "Do you remember how it came about that you told them?" GA responded that she did not. When asked whether she told "both of them or just one of them," GA testified, "Both."

told her when GA first relayed the details of sexual abuse. MRE 803A provides a hearsay exception to allow the admission of statements by victims of child abuse under the age of 10 that would otherwise be excluded.[6]

Before trial, defendant objected to the admission of GA's statements to Morgan on the grounds that they did not fall within the parameters of MRE 803A's hearsay exception—specifically, that the statements were not "spontaneous" as required by MRE 803A(2). Defendant argued that "it is clear from the statement of this Stacy Morgan . . . that while she's there[,] names are suggested to this child, including [Mr. Gursky's] name . . . she is continuously questioned as to what occurred here . . . . It is not spontaneous by any means." The trial court did not directly rule on this issue or address defendant's arguments regarding the lack of spontaneity. Instead, the court stated that

---

[6] Michigan Rule of Evidence 803A, which is a hearsay exception for a child's statement about sexual assault, provides in relevant part:

A statement describing an incident that included a sexual act performed with or on the declarant by the defendant or an accomplice is admissible to the extent that it corroborates testimony given by the declarant during the same proceeding, provided:

(1) the declarant was *under the age of ten* when the statement was made;

(2) the statement is shown to have been *spontaneous* and *without indication of manufacture*;

(3) either the declarant made the statement *immediately after the incident* or any *delay is excusable* as having been caused by fear or other equally effective circumstance; and

(4) the statement is introduced through the *testimony of someone other than the declarant*. [MRE 803A (emphasis added).]

"the reasonableness of the delay [between the alleged incidents and GA's disclosures is] . . . really the only issue I can consider." The court then held that the delay was reasonable, and Morgan's testimony thus admissible under MRE 803A.

The trial commenced, and GA testified that she had awakened on two separate occasions when defendant had touched her "private" with "his finger" and "tongue."[7] She also testified that she first told this to Morgan and her mother, but could not recall being asked any questions by Morgan. Morgan testified about what GA had originally told her when GA had first disclosed the alleged abuse, the details of which are set forth above. Lori testified about the circumstances regarding GA's first statement of sexual abuse. She further testified about how she had found defendant in GA's bedroom at 3:30 a.m. on the night of the second incident with the bedcovers pulled down and his hands on

---

[7] The facts of the actual sexual assaults, as described at trial, are as follows: The first and second contacts occurred on a night around August or September of 2005. GA was wearing pajamas and underwear in her bed. During the night, Gursky appeared in her bedroom, reached underneath her clothing, and touched her vaginal area with his finger and tongue. The third and fourth incidents occurred on one night at the end of April 2006. That night, GA had fallen asleep on the couch, so Lori put her to bed in her street clothes in the bedroom that GA shared with her brother, and Lori then went to bed herself. Lori woke up around 3:30 a.m. and noticed that her door had been closed; she walked out of her room and noticed that no one was in the living room where the TV was on, but she also saw that the door to the children's bedroom was slightly open. She opened the door and noticed Gursky kneeling by the middle of GA's bed, where the covers had been pushed to the end of the bed. GA was lying on her back and Gursky had his hand between her knee and feet. Lori asked Gursky what he was doing, and he replied that he was tucking in the children. Lori stood there a while longer, then left; a few minutes later she returned to the children's bedroom and noticed that GA had been changed into her nightgown. She then confronted Gursky: "Jason, what were you doing in there?" He repeated his prior answer: that he had changed GA into her nightgown. Lori stated that it left her feeling uneasy, so Gursky apologized and said it wouldn't happen again.

GA's legs. The nurse also testified about her medical evaluation of GA, including the scrape on GA's labia. In closing argument, the prosecutor argued that if the jury believed GA's testimony, they must convict; she then acknowledged that this testimony was buttressed by Morgan's testimony which "corroborates everything GA said on the stand."[8] Defendant was convicted of all four counts and sentenced to four concurrent terms of 15 to 30 years in prison.

On appeal, the Court of Appeals affirmed the admission of Morgan's testimony regarding GA's statements.[9] The panel concluded that although the trial court had abused its discretion by failing to address defendant's objection that GA's out-of-court statements were not spontaneously made, reversal was not required because the error was harmless: either way, the testimony was admissible. The Court of Appeals cited *People v Dunham* for the proposition that "answers to open-ended, innocuous questions are spontaneous."[10] The Court reviewed the record and then reasoned as follows:

> The victim responded emotionally to the first mention of the subject matter, crying and sucking her thumb. She willingly gave details that exceeded the scope of Morgan's inquiry. She pointed to her vaginal area and reported that the touching had occurred "down there," volunteered that the touching was with a finger and a tongue, denied that defendant touched her with his penis, and volunteered that the conduct had occurred over a greater span of time than suspected by Morgan. *Taken as a whole, the*

[8] The trial court also denied a directed verdict at the close of the prosecution's case, noting that GA "has been absolutely consistent with her version of events from the first time she disclosed it through . . . her testimony in court."

[9] *People v Gursky*, unpublished opinion per curiam of the Court of Appeals, issued July 17, 2008 (Docket No. 274945).

[10] 220 Mich App 268, 271-272; 559 NW2d 360 (1996).

*victim's statements were primarily spontaneous, despite being prompted by Morgan's questions*. Thus, the testimony would have been admissible had the trial court considered this objection and, therefore, the court's erroneous legal conclusion had no effect on the outcome of the trial.[11]

On the basis of this reasoning and finding the statements to be "primarily spontaneous,"[12] the Court affirmed defendant's conviction.

Defendant sought leave to appeal in this Court. We granted his application for leave to appeal and directed the parties to address specifically

> (1) whether the statements made by the complainant to Stacy Morgan on or about May 4, 2006, were "shown to have been spontaneous and without indication of manufacture" within the meaning of MRE 803A(2), and (2) whether it was more probable than not that any error in this regard was outcome determinative.[13]

## II. STANDARD OF REVIEW

The decision whether to admit evidence is within the trial court's discretion, which will be reversed only where there is an abuse of discretion.[14] However, decisions regarding the admission of evidence frequently involve preliminary questions of law, such as whether a rule of evidence or statute precludes admitting of the evidence. This Court reviews questions of law de novo.[15] Accordingly, "when such preliminary

---

[11] *Gursky*, unpub op at 3 (emphasis added).

[12] *Id.*

[13] *People v Gursky*, 483 Mich 999 (2009).

[14] *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998).

[15] *People v Sierb*, 456 Mich 519, 522; 581 NW2d 219 (1998).

questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law."[16]

## III. ANALYSIS

## A. THE "SPONTANEITY" REQUIREMENT OF MRE 803A

## 1. PRINCIPLES OF LAW

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[17] Hearsay is generally prohibited and may only be admitted at trial if provided for in an exception to the hearsay rule.[18] MRE 803A provides just such an exception for a child's statement regarding sexual assault in certain circumstances. The rule provides:

> A statement describing an incident that included a sexual act performed with or on the declarant by the defendant or an accomplice is admissible to the extent that it corroborates testimony given by the declarant during the same proceeding, provided:
>
> (1) the declarant was under the age of ten when the statement was made;
>
> (2) *the statement is shown to have been spontaneous and without indication of manufacture*;
>
> (3) either the declarant made the statement immediately after the incident or any delay is excusable as having been caused by fear or other equally effective circumstance; and

---

[16] *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

[17] MRE 801(c).

[18] MRE 802 ("Hearsay is not admissible except as provided by these rules.").

(4) the statement is introduced through the testimony of someone other than the declarant.

If the declarant made more than one corroborative statement about the incident, only the first is admissible under this rule.

A statement may not be admitted under this rule unless the proponent of the statement makes known to the adverse party the intent to offer the statement, and the particulars of the statement, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet the statement.[19]

MRE 803A, which codified the common-law "tender years exception," is also an exception to the prohibition against the use of hearsay testimony to bolster the credibility of a witness.[20] Relevant to this appeal, MRE 803A plainly requires the declarant's original statement to have been "spontaneous."

The Michigan Rules of Evidence do not define "spontaneous." As when construing statutes, in the absence of a specific definition of a common term used in an evidentiary rule, it is appropriate to look to the dictionary definition to discern the term's

---

[19] MRE 803A (emphasis added).

[20] This Court first recognized the common-law tender years rule in *People v Gage*, 62 Mich 271; 28 NW 835 (1886), as a permissible rule to allow hearsay in order to corroborate the testimony of a child complainant. "The rule in this State is that where the victim is of tender years the testimony of the details of her complaint may be introduced in corroboration of her evidence, if her statement is shown to have been spontaneous and without indication of manufacture; and delay in making the complaint is excusable so far as it is caused by fear or other equally effective circumstance." *People v Baker*, 251 Mich 322, 326; 232 NW 381 (1930) (holding also that only a child's first statement made is admissible under the exception). However, this Court held in *People v Kreiner*, 415 Mich 372, 377-378; 329 NW2d 716 (1982), that the common-law tender years exception to hearsay did not survive the adoption of the Michigan Rules of Evidence in 1978. In its stead, MRE 803A was adopted on December 17, 1990, and became effective on March 1, 1991.

11

ordinary and generally accepted meaning.[21] "Spontaneous" is defined as: "(1) coming or resulting from natural impulse or tendency; without effort or premeditation; natural and unconstrained; unplanned; (2) of a person: giving to acting on sudden impulse."[22]

The standards for spontaneity have been well litigated. The leading case on this issue in Michigan is *People v Dunham*, a decision of the Court of Appeals holding that statements made in response to customary, open-ended questions may be considered spontaneous.[23] In *Dunham*, a child was asked questions by an adult mediator during the child's parents' divorce. The questions were generally innocuous and customarily asked of all children participating in divorce mediation, yet the child in *Dunham* responded with allegations of sexual abuse. Virtually every Court of Appeals decision (including the panel in this case) has applied *Dunham* when examining the issue of spontaneity, although the holding has been broadened to stand for the general proposition that statements made in response to questioning may be considered spontaneous.[24] Until this

---

[21] See *Waknin v Chamberlain*, 467 Mich 329, 332; 653 NW2d 176 (2002) (providing that this Court construes a rule of evidence in the same manner as a court rule or statute); *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 113; 659 NW2d 597 (2003), citing *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999) (providing that this Court may refer to dictionary definitions in the absence of an explicit definition in the text being interpreted).

[22] *Webster's New Universal Unabridged Dictionary* (1996).

[23] 220 Mich App 268; 559 NW2d 360 (1997).

[24] See, e.g., *Gursky*, unpub op at 3 ("In *People v Dunham*, 220 Mich App 268, 271-272; 559 NW2d 360 [1996], this Court declared that answers to open-ended, innocuous questions are spontaneous.").

case, this Court has not itself discussed or defined the parameters under which a statement can be spontaneous for the purposes of MRE 803A.[25]

Other states' courts and the federal courts have addressed the issue of spontaneity as well; their decisions may be classified into separate groups for our purposes here. The most recognizable spontaneous statements are those that arise out of pure impulse—that is, they are made by the declarant without prompt, plan, or questioning. This type of "impulsive" statement is prototypically spontaneous because it appears to "come out of nowhere" or "out of the blue." For example, in *People v Bowers*,[26] the Colorado

---

[25] In 2008, this Court peremptorily reversed a decision of the Court of Appeals "for the reasons stated in the Court of Appeals dissenting opinion . . . ." *People v George*, 481 Mich 867 (2008), reversing and remanding *People v George*, unpublished opinion per curiam of the Court of Appeals, issued November 20, 2007 (Docket No. 271892). In *George*, the Court of Appeals affirmed the defendant's conviction in a split decision, with Judge GLEICHER dissenting from the portion of the majority opinion holding that the hearsay evidence provided by the victim's mother and sister was properly admitted under MRE 803A. The dissent argued that the trial court ignored evidence that the victim's hearsay statement was not the first one made to another person (as MRE 803A requires), that the statement was *not spontaneous*, and that the defendant was prejudiced by this error. Regarding spontaneity, Judge GLEICHER wrote:

> Additionally, the evidence did not support a finding that the victim spontaneously made her statement to [the victim's sister,] Marquayla. Both Marquayla and the mother testified that the victim's report to Marquayla was not spontaneous, but was made in response to questioning. Marquayla's testimony reflects that the questioning included threats about "lying" and "getting into trouble." The victim did not supply any other information regarding the circumstances of the statement she claimed to have made to Marquayla. The absence of a showing of spontaneity reinforces the need, in this case, for a pretrial determination as to the admissibility of the hearsay evidence pursuant to MRE 104. [*George*, unpub op at 4 (GLEICHER, J., dissenting).]

[26] 801 P2d 511 (Colo, 1990).

13

Supreme Court held that a child's statements were spontaneous where she made unexpected allegations of sexual abuse with no questioning or prompting from the adult. There, a babysitter was changing the child's brother's diaper when the child pointed to her brother's penis and said that her father "'had one just like that but it was bigger and he hurts me with it'" and the child also said to a foster care program coordinator that "'I don't like boneys . . . I don't like Daddy to put his boney on me.'"[27] The Court held that the statements were made "spontaneously without prompting or suggesting."[28]

Statements that are made as a result of prompt, plan, or questioning by a third party, yet are in some manner atypical, unexpected, or do not logically follow from the prompt are also widely considered spontaneous. This type of "non sequitur" statement is generally considered spontaneous because it shows that the declarant was acting from natural impulses or tendencies by responding atypically to what may otherwise have been innocent prompts. For example, in *State v Aaron L*,[29] the Connecticut Supreme Court held that the victim's statement showed spontaneity and consistency, and was therefore

[27] *Id.* at 514-515.

[28] *Id.* at 521. See also *State v Robinson*, 153 Ariz 191, 201; 735 P2d 801 (1987) (the absence of leading questions was an important factor supporting the admission of a child's statement after the child made statements implicating the defendant while at breakfast with her mother without being asked any questions; the statement was thus spontaneous and fully explained with "little prompting"); *In re Ne-Kia S*, 566 A2d 392, 395 (RI, 1989) (child responded to an adult's presence in his house by retrieving a stick and asking the adult to take it so the child's mother would no longer hit the child with it; the child later told the adult that his mother hit him on a daily basis and the adult testified that this was the "first thing Ne-kia told him. There was no reflection or deliberation involved.").

[29] 272 Conn 798; 865 A2d 1135 (2005).

14

sufficiently reliable to be admissible under Connecticut's residual exception to the hearsay rule. There, the child's statement, "'I'm not going to tell you that I touch daddy's pee-pee,'" did not "logically relate to the event that preceded it—her mother admonishing the victim that it was not nice to grope her breast."[30]

A third category that poses closer questions involves cases where statements are given as a result of open-ended and nonleading questions that include answers or information outside the scope of the questions themselves. Often, this type of unplanned yet responsive statement may be considered "spontaneous" because the information that results is based on knowledge independent of that provided in the question. For example, in *State v Shafer*, the Washington Supreme Court held that where the child "without prompting" told her mother about encounters with the defendant and the child's mother then inquired further, while the child's "statements in response to her mother's questioning were not entirely spontaneous, they were not the result of leading questions or a structured interrogation" and were thus admissible.[31] Similarly, the decision in

---

[30] *Id.* at 816. See also *Swan v Peterson*, 6 F3d 1373, 1377, 1381 (CA 9, 1993) (where a child's day-care provider told the child to put her dress down because "no one should look at or touch her 'private parts,'" the child replied "'Un-huh, Mommy and Daddy do'" and proceeded to make a detailed allegation of abuse, the court held that there was sufficient spontaneity because "[a]lthough [the child's] statement did not come out of the blue, it was not made in response to any question posed by [the caregiver]").

[31] 156 Wash 2d 381, 390; 128 P3d 87 (2006). See also *State v Young*, 62 Wash App 895, 901; 802 P2d 829 (1991) ("Washington law . . . recognizes that a child's answers are spontaneous so long as the questions are not leading or suggestive. . . . [And caselaw had] broadened the definition of 'spontaneous' to include 'the entire context in which the child [made] the statement.'").

*McCafferty v Leapley*[32] demonstrates how a spontaneous statement may arise out of simple questioning or innocent prompting. There, the child's statements "about how her 'daddy' sucked on her neck were given spontaneously in response to a nonleading question about how she got the mark on her neck. Her statements about this were consistent with what she told others and with what she demonstrated on [the adult's] own neck and with [the adult's] playroom dolls. . . . [It was also the child] who volunteered in play statements such as 'this is how she could sit on her daddy's weenie.'"[33] The aforementioned Michigan Court of Appeals decision in *Dunham*—holding that statements resulting from open-ended, nonleading questions may be spontaneous—is another prime example of this type of statement.

Statements falling within this last category, however, are also the type that are most likely to be nonspontaneous, and thus deserve extra scrutiny by trial courts before they may be admitted. When examining statements that have some of the same characteristics as GA's statements here, many courts have found a *lack* of spontaneity. The analysis they employed is informative for our purposes here. For example, the New Jersey Supreme Court's decision in *State v DG* provides a useful comparison.[34] There, the court concluded that there was not a "'probability that the statement [was] trustworthy'" as required by New Jersey's applicable rule, because the "situation under

---

[32] 944 F2d 445 (CA 8, 1991).

[33] *Id.* at 451.

[34] 157 NJ 112; 723 A2d 588 (1999).

16

which [the child] disclosed the sexual abuse was very stressful" and the child did not "spontaneously divulge information concerning the assault" to the adult, but rather the adult "interrogated her after finding her performing questionable acts while at play."[35] Interrogation, aggressive or leading questioning, and similar factual scenarios may all work to eliminate the spontaneity of a declarant's statement, which would thus render it inadmissible in the MRE 803A context.

## 2. APPLICATION

Having examined these principles of hearsay and the requirement of "spontaneity" generally, we must determine the parameters of this requirement in Michigan for the purposes of MRE 803A.

We hold that MRE 803A generally requires the declarant-victim to initiate the *subject of sexual abuse*. The question of spontaneity, at its essence, asks whether the statement is the creation of the child or another. There is certainly no doubt that the types of "impulsive" or "non sequitur" statements described above should be considered

---

[35] *Id.* at 122, 126-127 (holding that the child's statement regarding sexual abuse was not sufficiently trustworthy when made in direct response to the question "'[d]id anybody ever do anything like this to you to make you do this?'" after the child was found sexually touching her sister). See also *Felix v State*, 109 Nev 151, 167-168, 184; 849 P2d 220 (1993) (adult could not remember whether child's statement—"Martha hurt me here" while pointing to her vagina—was spontaneously made, and a second statement which came after "coercive questioning" could not be deemed reliable because answers provided by children after being questioned in a group were not spontaneous given that "there is no way to determine the extent to which the prior coercive questioning actually affected the statement."); *United States v Sumner*, 204 F3d 1182, 1186 (CA 8, 2000) (the child's statements were not spontaneous where the child responded to questions by merely answering "yes/no" or pointing).

spontaneous for the purposes of MRE 803A because they result from the declarant's "natural impulse or tendency" or are "unplanned" and made "without effort or premeditation," as a common definition of spontaneity provides. Such statements are quintessentially the "creation" of the child-declarant, and are thus certainly admissible under MRE 803A, assuming they meet the rule's other requirements.

This case, on the other hand, requires that we address the closer question: whether prompts from adults render a child's responsive statement inadmissible. This type of statement most often arises in the context of questioning by an adult. We hold that the mere fact that questioning occurred is not incompatible with a ruling that the child produced a spontaneous statement. However, for such statements to be admissible, the child must broach the subject of sexual abuse, and any questioning or prompts from adults must be nonleading or open-ended in order for the statement to be considered the creation of the child.

To be clear, we do *not* hold that any questioning by an adult automatically renders a statement "nonspontaneous" and thus inadmissible under MRE 803A. Open-ended, nonleading questions that do not specifically suggest sexual abuse do not pose a problem with eliciting potentially false claims of sexual abuse.[36] But where the initial questioning

---

[36] This approach is consistent with the Court of Appeals' original decision in *Dunham*, although not necessarily so with later panels of the Court of Appeals. For example, the Court of Appeals panel in the instant case applied *Dunham* in a broader context and unmoored from the factual situation of the original decision. In other instances, the Court of Appeals has applied this principle in a manner consistent with our decision today. By way of example, we note approvingly the analysis in *People v Leatherman*, unpublished opinion per curiam of the Court of Appeals, issued June 30,

focuses on possible sexual abuse, the resultant answers are not spontaneous because they do not arise without external cause. When questioning is involved, trial courts must look specifically at the questions posed in order to determine whether the questioning shaped, prompted, suggested, or otherwise implied the answers.

This approach requires that trial courts review the totality of the circumstances surrounding the statement in order to determine the issue of spontaneity. Even though courts should look at the *surrounding circumstances* and *larger context* in order to understand whether the statement was spontaneously made, we note that this review is not solely determinative of the question of admissibility. As MRE 803A requires, the statement must be "shown to have been spontaneous *and* without indication of manufacture."[37] The language of MRE 803A(2) clearly demonstrates that spontaneity is an independent requirement of admissibility rather than one factor that weighs in favor of

---

2005 (Docket No. 252679) at 8-9. There, the Court of Appeals properly assessed how this rule applies in close cases:

> Dona[, the victim's mother,] admitted asking the victim a few questions after the victim initially told her that "Uncle Brad touched me down there," gestured toward her private area, and said that defendant did other stuff, too. Dona then asked what other stuff defendant did and when the victim stated that defendant had a "vibrating handlebar machine," Dona asked what he did with it. Dona also asked the victim if defendant said anything to her. The questions were not so specific and leading [as] to taint the spontaneity of the victim's statements. Dona's questions were fairly general given the context of the victim's statements.

[37] MRE 803A(2) (emphasis added).

reliability or admissibility.[38] Thus, even if, considering the totality of the circumstances, the trial court determines that a statement is spontaneous for the purposes of MRE 803A(2), it must nevertheless also conduct the separate analyses necessary to determine whether the statement meets the other independent requirements of MRE 803A.

Turning to the facts of this case, we do not conclude that GA's statements were spontaneously given. Morgan directed GA to sit on Lori's lap, whereupon Morgan, Lori, or both questioned GA about sexual abuse. Morgan testified that she specifically broached the subject of sexual abuse on her initiative, questioning and otherwise probing GA for details. According to her trial testimony, Morgan asked GA numerous questions, including whether "anyone had been touching her," "Has anyone ever touched your private places?" "Where have you been touched? Who touched you?" and, after identifying defendant, "How did he touch you? What did he touch you with?" There is simply no indication in this case that GA would have made the statements she made or even broached the subject of sexual abuse if not otherwise prompted and, indeed, directly questioned by Morgan. Moreover, the testimony indicates that GA hesitated for "quite a

_____

[38] This is contrary to similar rules in other states where spontaneity is but one factor taken into account in determining whether a statement is sufficiently reliable and thus admissible. See, e.g., Ohio Evid R 807(A)(1) (providing that an out-of-court statement made by a child alleging sexual or physical violence against the child will not be excluded as hearsay if the "court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness" that render the statement reliable, "including but not limited to spontaneity . . . ."). However, unlike our sister-state's rule, MRE 803A contains no "factor among many" language that permits the admission of a child's statement simply upon a showing of reliability even if it was not spontaneously made.

while" before making the first statement; this tends to suggest that GA did not come forth with her statements on her own initiative, and thus that the statements were not necessarily products of her creation. More troubling, Morgan specifically suggested defendant's name to GA in a list of possible perpetrators. These facts demonstrate that GA's statements were not spontaneously given, nor did they arise out of an otherwise innocent conversation or set of nonleading and open-ended questions.

Although there were concededly spontaneous *elements* in GA's statements, this is insufficient to establish the *general* kind of spontaneity the rule requires. The Court of Appeals below concluded that "on balance" the statements were "primarily spontaneous" by focusing not on who broached the subject of sexual abuse, but instead on the nature of some of the questions that were open-ended, the degree of voluntariness GA displayed in answering questions and providing details not necessarily evident by the nature of the questions, and the physical reactions that GA exhibited as a result of the questioning. In this sense, the statements had spontaneous elements inasmuch as the answers were "given without premeditation," some answers seemed "unplanned," and some of her responses were "natural" and impulsive—and this is true *even if* GA's statements were given in response to direct questions. Nevertheless, when considering the questions in their entirety, we cannot conclude that GA's responses were, on the whole, spontaneous. As noted, because spontaneity is an independent requirement under MRE 803A(2) rather than one factor that weighs in favor of reliability and therefore admissibility, an overall sense of reliability or trustworthiness cannot render nonspontaneous statements admissible under MRE 803A.

21

In deciding that GA's statements are inadmissible, we must be clear that we do not expect a parent or other concerned adult not trained in the delicate nature of questioning a child regarding sexual abuse to recognize the danger of influencing a child's responses with the type of questioning used here. Nor do we expect that most parents or adults would treat this situation casually in order to allow the child to come forward with a "spontaneous" statement. Indeed, quite the contrary is likely to be true: it is perfectly natural for a parent or other concerned adult to engage in direct questioning or seek as much information as possible if his suspicions are aroused regarding possible sexual abuse of a child. We merely hold that statements resulting from such questioning cannot meet the narrow grounds for admissibility under MRE 803A. The prohibition on hearsay is the longstanding general rule, and thus exceptions to this prohibition must be appropriately enforced.[39]

In sum, we hold that a statement prompted by an adult's question specifically concerning sexual abuse is not spontaneous. This is true even if other indicia of reliability exist, such as an emotional response or details provided by the child that exceed the scope of the adult's inquiry. The Court of Appeals thereby erred by focusing on these other indicia of reliability rather than who broached the subject of sexual abuse, the specific questions asked by the adult during the conversation, and how some of the questioning suggested or implied answers. Viewing GA's statements in light of the

---

[39] This Court will assess in its administrative rules process whether the language of the current rule should be amended.

22

totality of the circumstances in this case, these critical factors render her statements nonspontaneous. In future cases, though, we emphasize that a statement made in response to an adult's question or comment that does not concern abuse, or where the *child* brings up the subject of abuse, may be spontaneous, and for the purposes of MRE 803A may be equally as admissible as if the child had made a statement arising "out of nowhere."

## B. HARMLESS ERROR ANALYSIS

Having determined that the trial court in this case abused its discretion by impermissibly allowing Stacy Morgan to testify regarding GA's out-of-court statements concerning alleged sexual abuse, we must next determine whether this error was sufficiently prejudicial to warrant reversal of defendant's convictions. We hold that it was not.

Defendant's claim of error in this case involves preserved, non-constitutional error. The standard we must apply here is governed by statute. MCL 769.26 provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the *improper admission* or rejection *of evidence*, or for error as to any matter of pleading or procedure, *unless* in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that *the error complained of has resulted in a miscarriage of justice*.[40]

In making this determination for preserved, non-constitutional error, this Court asks whether, absent the error, it is "more probable than not" that a different outcome would

---

[40] MCL 769.26 (emphasis added); see also *Lukity*, 460 Mich at 494-495.

23

have resulted.[41]   The burden is on the defendant to show that the error resulted in a miscarriage of justice.[42]   Where the error did not result in a miscarriage of justice and a defendant cannot meet this burden, we have deemed the error "harmless" and thus not meriting reversal of the conviction.[43]

Michigan law provides that where a hearsay statement is not offered and argued as substantive proof of guilt, but rather offered merely to corroborate the child's testimony, it is more likely that the error will be harmless.[44]   Moreover, the admission of a hearsay statement that is cumulative to in-court testimony by the declarant can be harmless error, particularly when corroborated by other evidence.[45]   This Court has cautioned, though, that "the fact that the statement [is] cumulative, standing alone, does not automatically

---

[41] See *Lukity*, 460 Mich at 495 ("[T]he effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error.").

[42] *Id.* at 493-494.

[43] See, e.g., *id.* at 491-493; *People v Mateo*, 453 Mich 203, 212-215; 551 NW2d 891 (1996).

[44] *People v Straight*, 430 Mich 418, 426-428; 424 NW2d 257 (1988).

[45] See, e.g., *Solomon v Shuell*, 435 Mich 104, 146-149; 457 NW2d 669 (1990) (BOYLE, J., concurring) (citing federal and published Court of Appeals decisions standing for the proposition that "improperly admitted hearsay evidence constitutes harmless error when it is merely cumulative of other properly admitted evidence"); *People v Hill*, 257 Mich App 126, 140; 667 NW2d 78 (2003) ("An erroneous admission of hearsay evidence can be rendered harmless error where corroborated by other competent testimony. . . . [Here, the admission of improper hearsay] was merely cumulative and did not place any relevant and damaging information before the jury that the jury did not know already. Therefore, there was not a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.").

result in a finding of harmless error. . . . [Instead, the] inquiry into prejudice focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence."[46] In a trial where the evidence essentially presents a one-on-one credibility contest between the victim and the defendant, hearsay evidence may tip the scales against the defendant, which means that the error is more harmful.[47] This may be even more likely when the hearsay statement was made by a young child, as opposed to an older child or adult.[48] However, if the declarant himself testified at trial, "any likelihood of prejudice was greatly diminished" because "the primary rationale for the exclusion of hearsay is the inability to test the reliability of out-of-court statements[.]"[49]

---

[46] *People v Smith*, 456 Mich 543, 555; 581 NW2d 654 (1998) (quotation marks and citations omitted). The Supreme Court of the United States has elaborated on factors relevant to making this determination:

> [W]hether . . . the error was harmless beyond a reasonable doubt . . . in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall strength of the prosecution's case. [*Delaware v Van Arsdall*, 475 US 673, 684; 106 S Ct 1431; 89 L Ed 2d 674 (1986).]

[47] *Straight*, 430 Mich at 427-428.

[48] See *Smith*, 456 Mich at 555 n 5 (distinguishing *Straight* from the facts of *Smith* because "it involved the testimony of a five-year-old complainant, while the present case involves the testimony of a sixteen-year-old complainant whom the defense had full opportunity to cross-examine").

[49] *Solomon*, 435 Mich at 148 (BOYLE, J., concurring), citing *Swartz v Dow Chem*, 414 Mich 433, 442; 326 NW2d 804 (1982).

Where the declarant himself testifies and is subject to cross-examination, the hearsay testimony is of less importance and less prejudicial.

On the basis of this harmless error framework, we are not convinced that defendant has met the burden of showing that, but for the fact that Morgan testified regarding GA's original statements of abuse, it is more probable than not that a different outcome would have occurred.

First, the prosecutor relied on Morgan's testimony only as *corroboration* for GA's direct testimony, and did not admit the testimony for its substantive value. The prosecutor's opening sentence when discussing Morgan's testimony during closing arguments explicitly indicated the limited purpose for which this testimony was offered: "Stacy Morgan's testimony corroborates everything that [GA] said on the stand last Friday." The prosecutor then proceeded to describe precisely how Morgan's testimony confirmed that GA's statements at trial and when talking to Morgan were the same. In essence, Morgan's statement was used to show that GA had not changed her story in the intervening time. Although Morgan's testimony was undoubtedly important, the record is clear that it simply was never used substantively by the prosecutor.[50] This is consistent

_____

[50] By way of example, the facts of this case stand in stark contrast to those of *People v Straight*. In *Straight*, this Court stated as follows:

> The hearsay testimony of the parents was not offered merely to corroborate the child's testimony, but rather was offered and argued for its substantive worth as the prosecution's closing argument clearly reveals:

> "And ladies and gentlemen, I would suggest to you that that was what was happening on that night in question that the statements made by

26

with an MRE 803A statement generally, which is only "admissible to the extent that it corroborates testimony given by the declarant during the same proceeding . . . ."[51]

Second, Morgan's testimony was cumulative to GA's testimony at trial. GA testified at trial and was subject to cross-examination. GA's testimony at trial was sufficient *standing alone* to support defendant's conviction of all four CSC charges.[52]

> [the child] at the hospital can be considered by you and even if she hasn't said on the stand what happened as she did yesterday, she just clammed up and said, 'I don't remember,' or, 'I don't want to say anything,' you can still find that the defendant is guilty merely from the testimony that the mother gave as to the information given to her and to the father as to what she said in the hospital."

These comments establish that the parents' testimony was presented to the jury *without limitation as substantive proof of defendant's guilt*. [*Straight*, 430 Mich at 426-427 (emphasis added).]

Moreover, reviewing the entire record, we do not agree with defendant's characterization of Morgan's testimony as outcome-determinative in the trial. In support, defendant argues that the prosecutor devoted pages of the record to discussing Morgan's testimony. While true that the prosecutor discussed Morgan's testimony in her closing statement, it was the prosecutor's "fifth reason" for conviction out of seven reasons total. Moreover, the prosecutor's discussion of Morgan's testimony accounts for less than 2½ transcript pages, which likely amounted to no more than a few minutes time during the prosecutor's closing statement. Despite defendant's characterization to the contrary, we do not believe that this represents the type of overwhelming reliance that would lead to the conclusion that Morgan's testimony was highly prejudicial.

[51] MRE 803A. This has always been the standard in Michigan, even under the prior common-law "tender years" version of the rule. See *Baker*, 251 Mich at 326 ("[W]here the victim is of tender years the testimony of the details of her complaint may be introduced in corroboration of her evidence . . . .").

[52] MCL 750.520h provides that "[t]he testimony of a victim need not be corroborated in prosecutions under sections [MCL 750.]520b to [MCL 750.]520g." Defendant was charged of four counts of first-degree criminal sexual conduct, MCL 750.520b(1)(a), and thus GA's testimony did not need to be corroborated in order for the

Although whether a hearsay statement is cumulative is not dispositive to this analysis under Michigan law, it is an indicator that the error was not highly prejudicial, particularly in the presence of other corroborating evidence. Here, the improperly admitted portions of Morgan's testimony did not introduce any new information to the jury. Instead, Morgan's testimony was merely cumulative to GA's in-court testimony.

Defendant contends that this case largely rested on GA's credibility and believability, which Morgan undoubtedly bolstered. However, there was *additional corroborating evidence* introduced which tends to belie this claim. Perhaps the most damaging of this evidence is Lori's testimony that she walked in to GA's room at 3:30 a.m. and found defendant kneeling at GA's bed, with the bedcovers pushed down, touching GA in the leg area. This testimony corroborates GA's testimony regarding the timing of the alleged crime, namely that defendant had touched and "kissed" her vaginal area that night, and corroborates precisely GA's testimony that her mother entered the

---

jury to convict defendant, assuming of course that the jury found her credible. And it appears that the jury *did* find GA credible in this case. For example, GA's testimony was the only direct evidence supporting the allegation that defendant had sexually assaulted her on the first occasion, yet the jury returned verdicts of guilty on those charges. Contrary to the dissent's implication, our assertion that the jury must find the victim credible if the victim's testimony is the only evidence of a crime in this type of case is merely a statement of obvious fact, not commentary on GA's credibility in this case.

Moreover, we reject the dissent's citation of a single law review article in an attempt to discredit GA's testimony in toto. *Post* at 4-5. While there are admittedly unique difficulties in questioning children, we certainly find no support in the dissent's sweeping proclamation that cross-examination of GA was possibly "useless" in this case. As discussed earlier, even though GA's statements were not "spontaneous," there are many other indicia of reliability with regard to her statement, which remained consistent over time.

28

room during the sexual assault and then left the room again. The nurse also testified that GA stated during the medical examination that she experienced pain in her vaginal area because "Jason put his finger in my pee-pee" and that defendant had kissed and touched her "where her pee-pee comes out from." This testimony was properly admitted under MRE 803(4), which allows the admission of statements made for purposes of medical treatment.[53] The nurse's testimony also introduced the fact that GA had recently suffered a scratch on her labia minora.[54] Thus, the other properly admitted evidence reveals that this case was *not* purely a one-on-one credibility contest between the defendant and the victim.

Third, to the degree that Morgan's testimony prejudiced defendant when she described how GA *reacted* during the conversation, the victim's emotional reactions *are not hearsay* and are perfectly admissible at trial.[55] Morgan testified about the horrified

---

[53] MRE 803(4) provides for admission of

[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

[54] Although the nurse testified that the scratch had likely occurred within the last 24 to 48 hours, she also testified that it could have occurred earlier, encompassing a period that corresponds to GA's account of when defendant assaulted her. The police officer who interviewed defendant testified that he noted that defendant's fingernails were "jagged or sharp, uneven."

[55] See MRE 801(c), which defines "hearsay" as a "statement"; a "statement" is then defined in MRE 801(a) as "(1) an oral or written assertion or (2) *nonverbal conduct of a person, if it is intended by the person as an assertion*." (Emphasis added). Thus,

look on GA's face, how her eyes welled up, how she began sucking her thumb, and her crying, bawling, and gasping for breath. Testimony to this effect would be damaging inasmuch as these were GA's inadvertent, non-coerced physical reactions that tended to show the reliability of her statements. More important, though, the testimony about these reactions *is admissible* as non-hearsay because they are nonassertive conduct.[56] Morgan could properly testify as to GA's nonassertive conduct that she personally observed and about which she has first-hand knowledge.

On the basis of this analysis, we hold that although Morgan's testimony was erroneously admitted, the error does not require reversal. Morgan's testimony was cumulative to and corroborated GA's testimony, which was further buttressed by other evidence. On this record, defendant cannot meet his burden of showing that a different outcome would have been the more probable result without Morgan's testimony.[57]

---

physical conduct or reactions are *not* hearsay as long as the conduct or reactions are not intended as assertions.

[56] This conduct can be contrasted with actual assertive conduct by GA, which would not be admissible. For example, when Morgan asked GA if Gursky had "kissed" her with his tongue on her mouth, GA replied "No, down here" and pointed to her vaginal area. GA's act of pointing would be assertive conduct designated as hearsay by MRE 801(a) and (c), and would not admissible in this case given the foregoing analysis.

[57] For these reasons, we similarly reject the dissent's contention that the error here was so harmful as to require a new trial. While the dissent criticizes a few of this opinion's characterizations or the weight this opinion gives to certain evidence, it fails to demonstrate how defendant has met *his* burden. Both defendant and the dissent call into question the credibility of certain evidence when viewed singularly, but when taken as a whole, the properly admitted evidence is sufficient to sustain defendant's conviction to the extent that we cannot say that it is more probable than not that a different outcome would have resulted.

## IV. CONCLUSION

We hold that the child's statements in this case were not "spontaneous" and therefore should not have been admitted under the limited hearsay exception created by MRE 803A. Statements specifically prompted by an adult's question concerning sexual abuse are not spontaneous, even if other indicia of trustworthiness or reliability exist. However, where the child brings up the subject of abuse, the resulting statement may be considered spontaneous, even if later questioning occurs by an adult. For such statements to be admissible, the child must broach the subject of sexual abuse, any questioning or prompts from adults must be nonleading and open-ended, and the statement must be the creation of the child.

Although the trial court abused its discretion by admitting hearsay testimony in this case, we nonetheless affirm defendant's convictions because the improper admission was harmless error. Defendant has not been able to show that the error is so prejudicial as to require reversal. Here, the hearsay statements were not used substantively at trial to prove guilt (but rather only to show consistency in the child's testimony), the statement was cumulative to other trial evidence, and there was other corroborating evidence of defendant's guilt.

The decision of the Court of Appeals is thus vacated, and defendant's conviction is affirmed on other grounds.

WEAVER, CORRIGAN, MARKMAN, and HATHAWAY, JJ., concurred with YOUNG, J.

31

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                  No. 137251

JASON MICHAEL GURSKY,

      Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I agree with the majority that the testimony at issue in this case did not involve statements that satisfy the "spontaneous" requirement of MRE 803A, and, as a result, the trial court abused its discretion when it allowed the testimony. I disagree, however, that this error was harmless. I think that a full review of the record reveals that this case rested largely on the complainant's credibility, and, as the prosecution stressed in its closing argument, Stacy Morgan's corroborating testimony bolstering GA's credibility was an essential piece of evidence that was critical to the outcome of this case. Therefore, I think that defendant has satisfied his burden under *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999), to show that it is "more probable than not" that a different

outcome would have resulted absent Morgan's testimony. Thus, I respectfully dissent from part III(B) of the majority opinion.[1]

The majority's harmless-error analysis goes astray in several places. First, the majority glosses over the key details regarding the important facts in this case. Second, the majority gives insufficient weight to this Court's caselaw regarding the importance of improperly admitted hearsay. Finally, I disagree with the majority's attempt to minimize the importance of the hearsay testimony to the prosecution's case.

To begin with, the majority ignores several key details regarding the facts that it relies on to argue that there was evidence, other than Morgan's testimony, that corroborated GA's testimony.

First, the majority states that "the most damaging of this [corroborative] evidence" was Lori's testimony "that she walked in to GA's room at 3:30 a.m. and found defendant kneeling at GA's bed, with the bedcovers pushed down, *touching GA in the leg area*." *Ante* at 28 (emphasis added). The majority mischaracterizes Lori's testimony and overlooks a potentially innocent explanation for the evidence that it finds so damning. A full review of the record indicates that Lori testified that defendant stayed up late playing video games with her son on the night that she saw defendant in GA's room. She also testified that she had told defendant previously that she preferred that GA sleep in her pajamas, but, on that night, she had put GA to bed in her street

---

[1] Although I remain committed to my *Lukity* dissent, 460 Mich at 504-510 (CAVANAGH, J., dissenting), because I think that defendant is entitled to a new trial even under the higher burden created by the majority in *Lukity*, I will apply that standard here.

clothes because GA had fallen asleep in the living room. When Lori confronted defendant about what he was doing in GA's room, he explained that he had changed GA into her pajamas. Further, while the majority states that Lori saw defendant "touching GA in the leg area," the record indicates that what Lori actually testified is that she saw defendant's hand "between [GA's] knee and feet," which has much less sinister implications. In light of these details, the corroborative nature of this particular evidence is substantially weakened, along with the majority's harmless-error conclusion.

Second, the majority also ignores several important details surrounding the nurse's and investigating detective's testimony. As the majority notes, the nurse testified that GA had a scratch on her labia minora, and the investigating detective testified that defendant's fingernails were jagged or sharp when he interviewed defendant. Although the majority acknowledges that the nurse testified that the scratch likely occurred in the 24 to 48 hours preceding her examination of GA, it fails to mention that the exam occurred *five days after* defendant allegedly sexually abused GA. Nor does the majority consider that the nurse testified that the scratch could have resulted from totally innocent behavior, such as a child playing. Furthermore, the nurse's testimony regarding GA's description of what had happened to her corroborates at most one instance of sexual abuse. It does not corroborate the testimony related to the other accusation of sexual abuse against defendant. Again, when this particular evidence is considered in context, its corroborative nature is substantially weakened, and the majority's harmless-error conclusion is further eroded.

3

The majority also gives insufficient weight to this Court's caselaw when it concludes that the prejudicial nature of the error was limited because GA testified at trial and was subject to cross-examination, making Morgan's testimony merely corroborative and cumulative. In making these generalizations, the majority pays lip service to this Court's warnings that "the fact that the statement was cumulative, standing alone, does not automatically result in a finding of harmless error," *People v Smith*, 456 Mich 543, 554; 581 NW2d 654 (1998), and that hearsay evidence may tip the scales against a defendant when a case presents a credibility contest, especially when the declarant is a young child. *People v Straight*, 430 Mich 418, 427-428; 424 NW2d 257 (1988); *Smith*, 456 Mich at 555 n 5. Unfortunately, however, the majority largely fails to heed those warnings in reaching its conclusion.

To start with, the utility of cross-examining a seven-year-old girl is debatable. In order to avoid the appearance of bullying a child before the jury, "no defense lawyer will subject a small child to an unnecessarily traumatic courtroom experience," even at the expense of leaving a possible error in the testimony undiscovered. Christiansen, *The testimony of child witnesses: Fact, fantasy, and the influence of pretrial interviews*, 62 Wash L R 705, 719 (1987). Further, a child "will adopt false memory as truth and be unable to distinguish the source of what she recalls. The sources of her knowledge are obscured and the possibility of falsehood hidden behind her sincere belief in the truth of her memory." *Id.* This concern is reflected in MRE 803A's limitations on the admissibility of hearsay statements made by children, which require that a child's statements be made as soon as practicable after the incident and that the statements be

4

spontaneous and without indication of manufacture. Therefore, given that Morgan's suggestive questioning occurred before GA testified at trial, cross-examination may have been useless in this case. As a result, the jury may have been "presented with an unshakably false basis for assessing the weight of her testimony," and defendant's felony convictions may have been based on inaccurate information that was impossible to test. *Id.* at 719-720.

Also, the majority's reliance on MCL 750.520h to argue that the prosecution in this case did not need to corroborate GA's testimony is misplaced. The credibility of GA's testimony was a critical issue because there was little physical evidence in this case. Indeed, as the majority notes, GA's testimony was the *only* basis for defendant's conviction for one of the alleged incidences of abuse. Presumably, the only support for the jury's finding was its belief that GA was credible, which was unfairly bolstered by the inadmissible hearsay. Therefore, as the majority acknowledges, the prosecution did not need to corroborate GA's testimony only if we are willing to "*assum[e] . . . that the jury found her credible.*" *Ante* at 28 n 52 (emphasis added).

The fact that GA's credibility was the key issue is precisely why the error was not harmless: Morgan's erroneously admitted hearsay testimony strongly bolstered GA's credibility. Thus, as the majority admits, we are left to assume that even without Morgan's testimony the jury would have found GA credible. This case simply presents too many unknowns to base multiple serious criminal convictions on a bare assumption.

Furthermore, there are several problems with the majority's reference to GA's credibility. First, it inaccurately states that GA's statements were "consistent over

5

time." This ignores that several days after Morgan's conversation with her, GA made a seemingly inconsistent statement when she asked Lori, "Mommy, what if it was a bad dream?"

Second, the majority's statement that it is not commenting on GA's credibility is incorrect and irrelevant. The majority does comment on the credibility of GA's testimony when it notes that GA's statement "remained consistent over time." *Ante* at 28 n 52. Because the majority must rely on GA's admittedly inadmissible statement to Morgan to label her statements "consistent," the majority only compounds the harm and proves that Morgan's testimony was critical to the prosecution's case.

Third, the majority's commentary on the credibility of GA's statements is irrelevant. The question is not whether this Court finds GA credible but whether the inadmissible hearsay unfairly influenced *the jury's* ability to determine GA's credibility. Because it is more probable than not that the hearsay influenced the jury and affected the trial's outcome, the error was not harmless.

Contrary to the majority's claim, I do not discredit GA's testimony "in toto." Rather, I merely note that children, by no fault of their own, are highly susceptible to influence. On the basis of this widely accepted observation, which the majority accepts, I conclude that the jury's ability to determine whether it found GA's testimony credible was unfairly influenced by Morgan's inadmissible testimony to the point that the error was not harmless.

Finally, the majority's attempt to minimize the importance of Morgan's hearsay testimony to the prosecution's case is also misleading. *Ante* at 26-27 n 50. Simply

6

because the prosecution listed Morgan's testimony as the "fifth reason" supporting conviction in her closing argument is not evidence that the testimony was not important. The order in which the prosecution presented the supporting evidence in her closing argument is not an indication of the weight that the prosecution or, more importantly, the jury gave the evidence. And, even if the order of presentation did somehow relate to the testimony's importance, it should be noted that in the first paragraphs of its closing argument, the prosecution stressed that GA's believability was key to the case. Furthermore, the first sentence of the prosecution's discussion of Morgan's testimony during closing argument stressed that Morgan's testimony "corroborated everything that [GA] said on the stand . . . ." Similarly, it is irrelevant that "the prosecutor's discussion of Morgan's testimony accounts for less than 2½ transcript pages," given that this is no indication of the weight that the jury gave Morgan's testimony. Indeed, in *People v Snyder*, 462 Mich 38; 609 NW2d 831 (2000), we remanded for a new trial under the *Lukity* standard because of an erroneous evidentiary ruling by the trial court that affected the complainant's credibility. We reasoned that, much like this case, "the prosecution's case rested almost entirely on the testimony of the complainant," and the "prosecutor took advantage of the circuit court's erroneous ruling during her closing argument." *Id.* at 44, 45.

In summary, defendant's convictions largely rested on GA's credibility, and, as the prosecution stressed, Morgan's corroborating testimony bolstering her credibility

was an essential piece of evidence in this case.[2]  Furthermore, much of the admissible "corroborating" evidence cited by the majority is less convincing when viewed in context, and the majority's conclusion that this case was not merely a credibility contest is called into question.  Finally, as the majority acknowledges, this Court has held that hearsay evidence is more harmful in credibility contests, particularly when the declarant is a young child.  Accordingly, I do not agree with the majority that the trial court's abuse of discretion was harmless error, and I would remand for a new trial.

KELLY, C.J., concurred with CAVANAGH, J.

---

[2] Indeed, the trial court based its decision to deny defendant's motion for a directed verdict on its belief that "[t]he complainant . . . has been absolutely consistent with her version of events from the first time she disclosed it [to Morgan] through . . . her testimony in court."