*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SEAN MICHAEL PLATZ,

        Defendant-Appellant.

UNPUBLISHED
June 11, 2020

No. 346815
Berrien Circuit Court
LC No. 2018-015456-FC

Before: K. F. KELLY, P.J., and FORT HOOD and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of criminal-sexual-conduct offenses involving two young relatives. We affirm.

## I. BACKGROUND

This case arose from allegations that defendant sexually abused his nieces. For clarity, we refer to the girls' mother and father simply as "mother" and "father" throughout this opinion. At trial, mother testified that PW, SW, and EW were her biological children, and her husband was their biological father. Father testified that he also had two sons, NW and AW, who lived with their biological mother but stayed with him every other weekend and for six months during the summer. Mother testified that PW, SW, and EW frequently visited their grandmother's house where defendant lived. The grandmother testified that PW, SW, and EW were her granddaughters, and defendant and father were her sons. The grandmother explained that defendant lived in the upstairs bedroom of her house and that he suffered from Prader Willi syndrome, which caused defendant to have the mental capacity of a teenager. The grandmother also referred to defendant's condition as "hidden penis syndrome" and stated that it was "a miracle" that defendant had a biological daughter.

At trial, the prosecutor showed SW a drawing of a girl's body, and she testified that the private parts at the top were called "boobs" and the private part in the front was called a "vagina." SW then testified that defendant touched her vagina with his hands and tongue more than once. She stated that the touches occurred in defendant's bedroom when she was between five and six years old, that she was naked when defendant touched her, and that his hand was moving. When

asked if defendant's "tongue touch[ed] the part you pee out of," SW responded, "Yes." SW also testified that EW was in the bedroom during one of the touching incidents, and that she saw defendant touch EW's vagina with his hands and tongue before he touched her as well.

EW similarly testified that defendant touched her "front private part" with his hand when she was between four and five years old. EW stated that the touches occurred in defendant's upstairs bedroom and bathroom. EW agreed that defendant took her pants off and touched "the part that you pee out of" during one of the bathroom incidents. EW also stated that she saw defendant use his hands to touch PW and SW "in the same front private parts" where he touched her. Meanwhile, EW's step-brother, AW, testified that he once saw EW sitting on defendant's lap on the stairs in the grandmother's house, and EW's leg was on top of defendant's leg. AW stated that one of defendant's hands was moving around in his pants while the other hand was touching EW's vagina over her pants. AW testified that he was 13 years old, and EW was about five years old at the time of this incident.

At trial, AW admitted that he had pleaded guilty to inappropriately touching PW and SW. Mother, father, and AW all testified that AW confessed to sexually abusing his stepsisters when mother and father confronted him about it in the girls' presence. Father testified that he asked the girls what was going on with AW, and if there was anything else he needed to know. In response, and "out of the blue," SW responded, "Yes. [Defendant]." Defendant objected to this testimony on hearsay grounds, and the prosecutor argued that the testimony was admissible under MRE 803a "as a child's first statement or disclosure of sexual abuse," because SW was six years old when she made the statement. The trial court overruled defendant's objection and allowed father to testify regarding SW's statement.

A family-case manager with the St. Joseph County Department of Child Services testified at trial that she received a complaint that SW, PW, and EW had been sexually abused by their brother and uncle, and that she took the girls to be forensically interviewed the next day. Two experts in forensic interviewing and childhood development testified that, based on their forensic interviews, they had no concerns that PW, SW, and EW were coached. Additionally, the experts explained to the jury that delayed disclosure was common for child-sexual-assault victims, and children are often unable to give a chronological timeline of their abuse and often did not remember or disclose everything all at once.

Before trial, the prosecutor filed a notice of intent to introduce other-acts evidence under MRE 404(b) to show "defendant's common scheme, plan, or system for grooming and sexually assaulting minor female victims," as well as "defendant's motive and intent to commit criminal sexual conduct" against the victims in this case. Defendant objected to the introduction of the other-acts evidence, arguing that the other acts were not relevant. The trial court determined that the probative value of the other-acts evidence narrowly outweighed any prejudicial effect and allowed the prosecutor to introduce the other-acts evidence at trial.

At trial, the grandmother testified that she saw defendant pinch his own daughter's breast when she was about five years old. In addition, mother testified that she went upstairs to use the bathroom at the grandmother's house and saw defendant in the shower with his daughter. Mother testified that both defendant and his daughter were naked, and the child was about eight years old at the time. Mother also testified that saw defendant and his daughter getting out of the shower in

the upstairs bathroom on one other occasion, when the child was about nine years old. Mother stated that defendant and his daughter were both completely naked again.

The jury convicted defendant of one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b) (penetration of a victim under 13 years old by someone at least 17 years old), and three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b) (sexual contact with a victim under 13 years old by someone at least 17 years old). The trial court sentenced defendant to 25 to 70 years' imprisonment for the CSC-I conviction and 71 to 180 months' imprisonment for each CSC-II conviction. Defendant now appeals.

## II. ANALYSIS

### A. OTHER-ACTS EVIDENCE

Defendant first argues that the trial court abused its discretion by admitting other-acts evidence regarding defendant's conduct with his daughter. Defendant argues that the conduct was innocent and that the evidence regarding the conduct was irrelevant and unduly prejudicial.

This Court reviews de novo preliminary issues of law and reviews for an abuse of discretion a trial court's evidentiary rulings. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). A trial court abuses its discretion when it chooses an outcome that falls outside the range of principled outcomes. *Id*. "Evidentiary error does not require reversal unless after an examination of the entire cause, it appears more probable than not that the error affected the outcome of the trial in light of the weight and strength of the properly admitted evidence." *Id*. at 199.

Under MRE 404(b), other-acts evidence is not admissible "to show the criminal propensity of an individual to establish that he acted in conformity therewith." *People v VanderVliet*, 444 Mich 52, 65; 508 NW2d 114 (1993). The other acts, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material." MRE 404(b)(1). In other words, other-acts evidence is admissible "whenever it is also relevant to a noncharacter purpose." *People v Denson*, 500 Mich 385, 399; 902 NW2d 306 (2017). Moreover, the party seeking the admission of other-acts evidence must show:

> (1) that the other acts evidence is for a proper purpose (other than to show character and action in conformity therewith), (2) that the evidence is relevant to an issue of fact that is of consequence at trial, and (3) that, under MRE 403, the danger of unfair prejudice does not substantially outweigh the probative value of the evidence. [*People v Steele*, 283 Mich App 472, 479; 769 NW2d 256 (2009).]

In this case, the prosecutor argued that the breast-pinching incident and the shower incidents would tend to show "defendant's common scheme, plan, or system of grooming and sexually assaulting minor female victims" and "defendant's motive and intent to commit criminal sexual conduct" against SW and EW. Both of these noncharacter purposes for the admission of the other-acts evidence were specifically enumerated under MRE 404(b) and, thus, satisfy the first admissibility requirement. See MRE 404(b)(1); *People v Sabin (After Remand)*, 463 Mich 43, 55; 614 NW2d 888 (2000).

It is common, however, for trial courts to erroneously "admit other-acts evidence merely because the proponent has articulated a permissible purpose." *Denson*, 500 Mich at 400. Therefore, close scrutiny of the logical relevance of the other-acts evidence is important "to determine whether an articulated purpose is, in fact, merely a front for the improper admission of other-acts evidence." *Id*. Logical relevance requires the evidence of other acts to be both material and probative. *Id*. at 401. Evidence of other-acts is material if it relates to a fact that is at issue in the case, and it is probative if it has any tendency to make the existence of a material fact that is of consequence to the determination of the action "more probable or less probable than it would be without the evidence." *Id*. at 401-402.

Similar other-acts evidence is "logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Sabin*, 463 Mich at 63. Although the other acts do not need to be distinctive or unusual to establish the existence of a common scheme or plan, "[t]here must be *such a concurrence of common features* that the charged acts and the other acts are logically seen as part of a general plan, scheme, or design." *Steele*, 283 Mich App at 479.

In *Sabin*, 463 Mich at 66, the Michigan Supreme Court determined that evidence of other acts involving an alleged sexual assault of the defendant's daughter shared sufficient common features with the charged assault to infer a plan, scheme, or system. The Court found that the other acts and charged acts shared similarities "beyond mere commission of acts of sexual abuse" because defendant had a parental relationship with the victims, the victims were similar ages at the time of the abuse, and defendant used the victims' fear of breaking up the family to keep them quiet. *Id*. The *Sabin* Court determined that it could be inferred from these similarities that defendant took advantage of his parental relationship and position of authority to control his victims and perpetrate abuse. *Id*. Although the Court also noted dissimilarities between the charged and uncharged acts, the Court concluded that because "reasonable persons could disagree on whether the charged and uncharged acts contained sufficient common features to infer the existence of a common system used by defendant in committing the acts," the trial court's decision regarding the close evidentiary question was not an abuse of discretion. *Id*. at 67.

In this case, defendant's alleged conduct with his daughter shared sufficient common features with the charged offenses to infer a plan, scheme, or system. The charged and uncharged acts were similar because defendant's daughter, SW, and EW were each related to defendant, they each endured multiple instances of the alleged abuse, they were each between five and nine years old at the time of the abuse, and each instance of abuse occurred in defendant's upstairs bedroom or bathroom. The jury could have inferred from these similarities that defendant used his familial relationship and position of apparent authority to manipulate the girls and perpetuate his abuse. Although there were also differences between defendant's conduct with his daughter and his conduct with his nieces, reasonable persons could disagree regarding whether the acts were sufficiently similar to infer that defendant used a common plan or scheme to abuse the young girls who often visited his place of residence. As in *Sabin*, because this was a close evidentiary question, the trial court did not abuse its discretion by determining that the other-acts evidence in this case was logically relevant to show a common plan, scheme, or system. See *id*.

Even when other-acts evidence is logically relevant, it must still survive the MRE 403 balancing test to be admissible. See *Steele*, 283 Mich App at 479. Under MRE 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403(b). Michigan courts have consistently found that the trial court is in the best position to make an MRE 403 determination. See *Sabin*, 463 Mich at 71; *People v Ackerman*, 257 Mich App 434, 442; 669 NW2d 818 (2003).

In this case, the other-acts evidence was probative of defendant's common plan or scheme and his intent to commit CSC-II. The trial court acknowledged that it was a close call but determined that the probative value of the other-acts evidence narrowly outweighed the danger of unfair prejudice. Because the trial court was in the best position to make this determination under MRE 403, the trial court did not abuse its discretion by admitting the other-acts evidence under the circumstances. See *Sabin*, 463 Mich at 71; *Ackerman*, 257 Mich App at 442.

Additionally, any error in the admission of the other-acts evidence in this case was harmless because the admission of the evidence did not obviously affect the outcome of the trial. See *Benton*, 294 Mich App at 195. In this case, SW's and EW's testimony describing defendant's abuse constituted sufficient evidence to convict defendant because a victim's testimony, alone, is generally sufficient to support a criminal-sexual-conduct conviction. See *People v Solloway*, 316 Mich App 174, 181, 196; 891 NW2d 255 (2016). Moreover, their testimony was corroborated by AW's testimony regarding the time he saw EW sitting on defendant's lap and by the expert witnesses' testimony regarding their belief that SW and EW were not coached. See *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000). The expert testimony further corroborated SW's and EW's testimony by explaining the typicality of delayed disclosure and a child-sexual-abuse victim's inability to remember details, to disclose everything at once, and provide a chronological timeline. See *id*. Therefore, it does not appear more probable than not that an error regarding the admission of the other-acts evidence affected the outcome of the trial in light of the testimony given by SW, EW, AW, and the expert witnesses. See *id.* at 766; *Benton*, 294 Mich App 195.

## B. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that there was not sufficient evidence of sexual penetration to support his CSC-I conviction.

This Court reviews de novo a claim of insufficient evidence. *People v Jones*, 297 Mich App 80, 86; 823 NW2d 312 (2012). "The evidence is reviewed in a light most favorable to the prosecution to determine whether a rational jury could find that each element of the crime was proved beyond a reasonable doubt." *Id*. In making the determination, this Court must "not interfere with the fact-finder's role of deciding the credibility of the witnesses." *Solloway*, 316 Mich App at 180. "Circumstantial evidence and the reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018).

To convict a defendant of CSC-I, the prosecutor must prove beyond a reasonable doubt that the defendant engaged in sexual penetration of a person under 13 years old. MCL 750.520b(1)(a). Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal

intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body." MCL 750.520a(r). Under this definition, penetration includes any intrusion into the labia majora. *People v Lockett*, 295 Mich App 165, 188; 814 NW2d 295 (2012). Cunnilingus constitutes sexual penetration because the act requires a person's mouth to be placed "upon the external genital organs of the female which lie between the labia." *People v Legg*, 197 Mich App 131, 133; 494 NW2d 797 (1992).

Because a victim's "testimony regarding a defendant's commission of sexual acts is sufficient evidence to support a conviction for CSC-I," a victim's testimony that the defendant touched the "urethral opening, vaginal opening, or labia" with his mouth suffices to establish sexual penetration through cunnilingus. *Id*.; see also *People v Bailey*, 310 Mich App 703, 714; 873 NW2d 855 (2015). Moreover, the introduction of conflicting evidence does not affect the sufficiency of the victim's testimony because, as the trier of fact, the jury may choose which evidence to believe. *People v Smith*, 205 Mich App 69, 71; 517 NW2d 225 (1994). "If the jury [chooses] to believe the victim's testimony, they would be justified in convicting defendant" of the charged offense despite the introduction of conflicting evidence at trial. *Id*.

In this case, SW testified that defendant touched her vagina and "the part you pee out of" with his tongue. This testimony established that defendant performed cunnilingus on SW by touching his mouth to her "urethral opening, vaginal opening, or labia." *Legg*, 197 Mich App at 133. Because cunnilingus by definition constitutes an act of sexual penetration, SW's testimony sufficiently supported a finding that defendant sexually penetrated her. See *id*.; MCL 750.520a(r). To the extent that any other testimony conflicts with SW's account, the sufficiency of SW's testimony was not affected because the jury could have believed SW rather than the conflicting testimony in reaching its verdict. See *Smith*, 205 Mich App at 71. Therefore, SW's testimony provided sufficient evidence to support defendant's CSC-I conviction. See *Bailey*, 310 Mich App 703, 714; *Legg*, 197 Mich App at 133.

## C. JUDICIAL CONDUCT

Defendant next argues that the trial court committed misconduct and deprived defendant of a fair trial by improperly commenting on the credibility of EW and suggesting that defendant's cross-examination of SW was irrelevant.

Generally, the question "whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). Because defendant failed to preserve the issue of judicial misconduct by objecting at trial, we review the trial court's conduct for plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); *People v Sardy*, 216 Mich App 111, 117-118; 549 NW2d 23 (1996).

A defendant bears the burden to overcome a strong presumption of judicial impartiality. *People v Willis*, 322 Mich App 579, 588; 914 NW2d 384 (2018). The trial court commits misconduct that pierces the veil of impartiality and "violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the [trial court]'s conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Stevens*, 498 Mich at 171. The existence of judicial misconduct is a

fact-specific inquiry by which the reviewing court must consider the "cumulative effect" of the alleged errors. *Willis*, 322 Mich App at 588. "A single instance of misconduct generally does not create an appearance that the trial judge is biased, unless the instance is so egregious that it pierces the veil of impartiality." *Id*. (cleaned up). To evaluate judicial conduct this Court should consider a variety of factors, including:

> the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Stevens*, 498 Mich at 172.]

First, this Court should determine the nature of the judicial conduct at issue. *Id*. at 172-173. Biased commentary from a trial court is one potential form of judicial misconduct. *Willis*, 322 Mich App at 590. Yet, a trial court's critical or even hostile comment directed at one party generally does not pierce the veil of judicial impartiality, "unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Id*. (cleaned up). Moreover, the trial court enjoys wide discretion to control the trial proceedings and impose reasonable limitations on cross-examination to avoid "harassment, prejudice, confusion of the issues, and repetitiveness." *People v Biddles*, 316 Mich App 148, 153; 896 NW2d 461 (2016). In fact, the trial court has a duty to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." MRE 611(a).

Next, this Court should consider the trial court's tone and demeanor in front of the jury. *Stevens*, 498 Mich at 174. Although this Court cannot evaluate the trial court's tone and demeanor first hand, sometimes "the very nature of the words used by the judge can exhibit hostility, bias, or incredulity." *Id*. at 176. Jurors are easily influenced by even a slight indication of bias from the trial court because they look to the trial court for guidance and instruction. *Id*. at 174. Therefore, although the trial court is presumed to be impartial, unintentional comments that exhibit the trial court's opinion of the parties can deprive the defendant of a fair trial. *Id*. at 174-175. The substance of the trial court's words and the manner and context in which they are said are important factors to consider when determining whether the trial court unintentionally conveyed bias toward a party. *Id*. at 175. Lastly, the presence of a curative instruction can alleviate the appearance of bias. *Id*. at 177. "[A] curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct" because "jurors are presumed to follow their instructions." *Id*. (cleaned up).

Here, defendant argues that the trial court vouched for EW's credibility when it asked her, after a brief recess, to continue telling the truth. Specifically, the trial court stated as follows:

> When we broke, [the prosecutor] had just finished the direct examination of [EW]. Now, it's [defense counsel]'s opportunity for cross-examination.

> Remember, [EW], earlier you raised your hand and you promised to tell the truth? Do you remember that, yes—

[*EW*]: Yes.

*The Court*: —or no?

[*EW*]: Yes.

*The Court*: And you promise that you'll still continue to tell the truth?

[*EW*]: Yes.

*The Court*: Keep telling the truth?  Okay, thank you.

Defendant claims that these comments—requesting that EW "continue" or "keep" telling the truth—implied that that the trial court believed EW's prior testimony to be credible.  These isolated comments did not demonstrate "a deep-seated favoritism or antagonism" that affected the jury's ability to exercise fair judgment.  See *Willis*, 322 Mich App at 588, 590 (cleaned up).  When examined in context, the trial court's comments simply conveyed the importance of EW's continuing obligation to tell the truth in a manner that EW could easily understand.  See *Stevens*, 498 Mich at 175.  Given this context, the jury was unlikely to perceive even an unintentional bias from the trial court's comments to EW.  See *id*. at 175-176.  Under the totality of the circumstances, the trial court's comments to EW did not pierce the veil of impartiality or deprive defendant of a fair trial.  See *id*. at 171.

Defendant also argues that the trial court committed judicial misconduct by interrupting defendant's cross-examination of SW.  In relevant part, defendant's cross-examination of SW went as follows:

*Q*.  Do you remember anything that you were wearing at the time that any of these [incidents of sexual abuse] occurred?

*A*.  No.

*Q*.  Long sleeve, short sleeves?

*A*.  No.

*Q*.  Jeans?

*A*.  No.

*Q*.  What about the big floppy hats that you and grandma would wear when you'd played dress-up, did you ever have one of these?

*A*.  No.

*Q*.  No.  What about your shoes, what kind of shoes were you wearing?

*A*.  My shoes were downstairs.

*Q.* Your shoes were downstairs. Tennis shoes?

*A.* No.

*Q.* What kind of shoes?

*A.* Sandals.

*Q.* Sandals? What about in the wintertime? You said sometimes it was in—

*The Court*: Mis—

*Q.* —the wintertime—

*The Court*: [Defense counsel], I'm giving you some leeway but we've gotta move along to get this trial done. So please move—move on to something relevant.

[*Defense Counsel*]: I'm just trying to see how much detail she's familiar—

*The Court*: Okay, I—

[*Defense Counsel*]: —with, judge.

*The Court*: —understand that. I've given you a lot of latitude. We've gotta move this trial along. Get to something relevant, please.

Defendant claims that he was prejudiced by the trial court's comments that defense counsel should "move on" or "get to something more relevant" because they implied that defendant's impeachment of SW was not relevant. It was well within the trial court's discretion to limit defendant's cross-examination on the basis of relevancy to avoid repetitiveness and needless consumption of time. See *Biddles*, 316 Mich App at 153. When defendant's cross-examination of SW is viewed as a whole, it can be seen that defendant had already succeeded in attacking SW's credibility based on her inability to remember details such as what she was wearing at the time of the alleged abuse. See *Stevens*, 498 Mich at 175. Therefore, the trial court did not err by instructing defense counsel to move on to something more relevant. See *id*.; *Biddles*, 316 Mich App at 153.

Additionally, the trial court's interruption did not prejudice defendant by preventing him from effectively cross-examining SW and eliciting contradictory testimony. In fact, immediately after the trial court's interruption, defense counsel asked SW how many times defendant touched her, and SW stated that he touched her "a lot" and held up 10 fingers. However, after having her memory refreshed, SW admitted that she had previously testified that defendant only touched her two times. So, not only was defendant able to elicit testimony showing that SW was unable to recall the details surrounding the alleged abuse before the trial court's interruption, but defendant was also able to elicit contradictory testimony regarding the number of times that the alleged abuse occurred after the trial court's interruption. Therefore, the effectiveness of defendant's cross-examination was not harmed by the trial court's comments.

Moreover, the trial court instructed the jury at the beginning and end of trial that its comments did not express the trial court's opinion of the case and were not to be considered in reaching a verdict. See *Stevens*, 498 Mich at 177. Because jurors are presumed to follow instructions, the instructions given here were sufficient to alleviate any error arising from the trial court's comments. See *id*. Therefore, defendant failed to show how defendant's brief and isolated comments pierced the veil of impartiality to deprive him of a fair trial given the totality of the circumstances. See *Stevens*, 498 Mich at 171.

## D. MRE 803A

Finally, defendant argues that the trial court erred by improperly allowing father to testify regarding SW's disclosure statements under MRE 803A because the statements were not made spontaneously and without undue delay during SW's first disclosure of the abuse.

At trial, defense counsel only generally objected that the SW's disclosure statements constituted hearsay but made no reference to the requirements under MRE 803A. Therefore, we review this unpreserved issue for plain error affecting substantial rights. See *Carines*, 460 Mich at 763; *Aldrich*, 246 Mich App at 113. Under plain error review, defendant bears the burden to show that an error occurred, it was clear or obvious, and it affected substantial rights. *Id*. An error affects substantial rights when it caused prejudice or "affected the outcome of the lower court proceedings." *Id*. Even when these requirements are met, this Court has discretion to decide whether the "error resulted in the conviction of an actually innocent defendant or when error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," warranting a reversal. *Id*. at 763-764 (cleaned up).

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally inadmissible at trial unless if falls under an exception. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). MRE 803A provides an exception to the hearsay rule as follows:

> A statement describing an incident that included a sexual act performed with or on the declarant by the defendant or an accomplice is admissible to the extent that it corroborates testimony given by the declarant during the same proceeding, provided:
>
> (1) the declarant was under the age of ten when the statement was made;
>
> (2) the statement is shown to have been spontaneous and without indication of manufacture;
>
> (3) either the declarant made the statement immediately after the incident or any delay is excusable as having been caused by fear or other equally effective circumstance; and
>
> (4) the statement is introduced through the testimony of someone other than the declarant.

> If the declarant made more than one corroborative statement about the incident, only the first is admissible under this rule.

Only statements made in response to "[o]pen-ended, nonleading questions that do not specifically suggest sexual abuse" are spontaneous if the declarant is the one who initiated the topic of sexual abuse. *Gursky*, 486 Mich at 614. To determine whether a statement was truly spontaneous, this Court must examine the totality of the circumstances surrounding the statement and the larger context in which the disclosure was made. *Id*. at 615.

In this case, defendant first argues that SW's statement to her father as he described it at trial was not SW's first disclosure of defendant's sexual abuse because SW testified that she made a disclosure "[a]fter the day it happened." Defendant mischaracterizes SW's testimony:

> *Q*. Did you tell your mom and dad what happened?
>
> *A*. Yes.
>
> *Q*. When?
>
>         \*   \*   \*
>
> *A*. After the days it happened.
>
> *Q*. After when?
>
> *A*. After the day it happened.
>
> *Q*. What day was that?
>
> *A*. I don't know.
>
>         \*   \*   \*
>
> *Q*. Was it summer or winter?
>
> *A*. Yes.
>
> *Q*. Was it summertime or wintertime?
>
> *A*. Summer.
>
> *Q*. And who was all there?
>
> *A*. My home family that lived in the house like—
>
> *Q*. And—
>
> *A*. —my brothers and my sisters and my mom and dad.

In context, SW's statement that she disclosed defendant's abuse "[a]fter the day it happened" did not mean that the disclosure occurred the day immediately after defendant abused her, rather it likely meant that the disclosure occurred on one of the days following defendant's abuse. SW's follow-up statement that she did not know the exact day that she made the disclosure supports the latter interpretation. Moreover, although SW claimed that mother, father, and AW were present during her first disclosure, they all deny learning about defendant's abuse before the disclosure incident described by father at a trial. Therefore, based on SW's own testimony, the trial court did not err by admitting SW's statement to father regarding defendant's abuse under MRE 803A as her first disclosure. See MRE 803A; *Carines*, 460 Mich at 763.

Next, defendant argues that SW's statements to her father occurred too long after defendant's abuse to be admissible under MRE 803A. Because there was no evidence indicating when the last incident of defendant's abuse occurred, however, it is not possible to determine how much time passed from the last incident of abuse until SW disclosed the abuse to father. SW testified that defendant abused her multiple times while she was between five and six years old, and SW was six years old at the time that the complaint was filed regarding defendant's alleged abuse. Based on this evidence, defendant's abuse could have occurred just days before SW disclosed the abuse to her father because both the disclosure and defendant's abuse occurred while SW was six years old. The evidence indicates that the delay could not have been more than nine months long because SW testified that defendant abused her while she was six years old, and SW turned six years old in January 2017—less than nine months before the complaint was filed on October 9, 2017. Therefore, the trial court did not err by declining to exclude SW's statement to father regarding defendant's abuse under MRE 803A based on undue delay. See MRE 803A(3); *Carines*, 460 Mich at 763.

Lastly, defendant argues that SW's statements to her father disclosing defendant's abuse were not spontaneous. Although father testified that SW's disclosure was made after he asked her whether "there [was] anything else [he] needed to know," father's question was open-ended. See *Gursky*, 486 Mich at 608, 613. Father also testified that he asked the question in reference to the allegations of abuse against AW, but then SW implicated defendant "out of the blue." Despite the fact that the topic of sexual abuse had been raised in regard to AW, father's testimony that SW disclosed defendant's abuse "out of the blue" tends to show that SW spontaneously initiated the topic of *defendant's* sexual abuse. See *id*. at 613-615. Additionally, AW's and SW's testimony further support a finding that SW's disclosure to father was spontaneous. See *id*. at 608, 613, 615. AW testified that SW brought up the topic of defendant's abuse by stating that AW was not the only one who touched her, and SW testified that she "just told" when asked how the topic of defendant's abuse arose. The totality of the circumstances surrounding the disclosure indicate that SW's statements to her father were spontaneous as required under MRE 803A. See *id*. at 615.

Moreover, even if the trial court erred by allowing father to testify regarding SW's disclosure statements, defendant failed to show that the error affected the outcome of the proceedings. See *Carines*, 460 Mich at 763. As previously stated, SW's testimony was sufficient to support defendant's convictions, especially in light of the corroborating testimony given by EW, AW, and the expert witnesses. See *Solloway*, 316 Mich App at 181. Therefore, the trial court did not plainly err. See *Carines*, 460 Mich at 763.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle