*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JEROME JOSEPH MORGAN,

      Defendant-Appellant.

UNPUBLISHED
June 24, 2021

No. 351580
Wayne Circuit Court
LC No. 19-004056-01-FC

Before: STEPHENS, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his bench-trial convictions for two counts of first-degree criminal sexual conduct (CSC-I) (victim under 13 years of age), MCL 750.520b(2)(b). The two counts were based on evidence that defendant penetrated the genital opening of the child victim with his tongue and fingers. Defendant was acquitted of two counts of CSC-I alleging that he penetrated the victim's genital opening with his penis. On appeal, defendant raises multiple claims of ineffective assistance of counsel, at least one of which has merit. We therefore vacate defendant's convictions and remand for a new trial.

## I. BACKGROUND

The victim was 11 years old at the time of trial, but the assaults took place between when the victim was eight and ten. Defendant was married to Karen Morgan, who is the victim's maternal great aunt. Defendant had no blood relation to the victim or her mother. The victim used to stay overnight at Karen and defendant's home on some weekends while her mother worked. The victim had three cousins that also stayed with Karen and defendant on the weekends—AL, SB, and RLP.

Defendant and Karen lived in a two-bedroom apartment on the second floor of a two-family flat. Karen and defendant shared one room, and Karen's son, Henry Lowery, lived in the second bedroom. Witnesses at trial described Karen and defendant's home as small, cluttered, and difficult to walk around in, and testified that the floors of the home squeaked whenever you walked on them. According to the victim, at night, she and her cousins would sleep in the dining room,

where there was also a couch. Some of the children would sleep on pillows on the floor while the others would sleep on the couch.

The victim testified that she did not like defendant "[b]ecause he was mean to [her] sometimes" and she thought that he treated her differently than he treated her cousins. She also testified that when she would stay at Karen and defendant's home, defendant would touch her "inappropriately." She said it happened "[s]ometimes at night," and other times during the day. The victim could not remember details about the first time that defendant touched her inappropriately, but she remembered that defendant told her not to "tell nobody or I'm going to hurt you and your family."

The victim remembered more details about one time that defendant assaulted her at night, and recounted that time at trial. According to the victim, one night while she was sleeping on some cushions on the floor in the dining room, defendant came in, picked her up, and carried her to his bedroom, which was near the dining room. The victim testified that Karen was not home at the time because she was at work. According to the victim, once in defendant's room, defendant put her on the bed on her back, pulled down her pants, and "put his mouth on [her] private area." The victim described her "private area" as the body part that she uses to "[p]ee." According to the victim, she felt defendant's tongue on her "private area." The victim testified that defendant eventually turned her over onto her stomach and "put his private area on [her] private area." The victim said that she did not see defendant's "private part," but she "felt it back when he flipped [her] over[.]" According to the victim, defendant was clothed.

The victim also remembered that defendant would sometimes sexually assault her in the dining room. The victim testified that sometimes defendant would come into where she was sleeping "and he would try to be really quiet and he would pull down [her] pants and he would put his hands on [her] private area." The victim explained that she thought defendant was trying to be quiet because he was moving really slow. The victim testified that she "felt [defendant's] fingers around [her] private area," and that defendant would touch her "private area for awhile [sic] and then" leave.

In giving its ruling, the trial court recognized that this case came down to whether the victim's allegations should be believed, and walked through factors it considered in determining whether the victim was credible. The court ultimately concluded that the victim was "a credible witness and that she testified honestly." Despite that the victim was credible, the court found insufficient evidence to prove that "defendant penetrated her genital opening with his penis." But the court concluded that there was sufficient evidence to prove beyond a reasonable doubt that "defendant performed cunnilingus and penetrated [the victim's] genital opening with his fingers." The court therefore found defendant guilty of two counts of CSC-I, but not guilty of two other counts.

This appeal followed.

## II. STANDARD OF REVIEW

On appeal, defendant raises several claims of ineffective assistance of counsel. Whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law—the

trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo. *People v Dixon-Bey*, 321 Mich App 490, 515; 909 NW2d 458 (2017). Although defendant preserved his claim by moving for an evidentiary hearing in this Court, see *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), this Court denied defendant's motion.[1] Because no evidentiary hearing was held, there are no factual findings to review, and this Court's review is limited to errors apparent on the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

## III. ANALYSIS

Among his claims of ineffective assistance on appeal, defendant argues that his trial counsel provided ineffective assistance when he cross-examined the victim using her preliminary examination testimony because that testimony was consistent with the testimony she gave at trial. We agree.

To establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Effective assistance is "strongly presumed," *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012), and the defendant bears the heavy burden of proving otherwise, *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004). Counsel's performance cannot be judged with the "benefit of hindsight." *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008).

Decisions about what questions to ask witnesses are presumed to be matters of trial strategy, "and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). This is "because counsel may be required to take calculated risks to win a case." *Heft*, 299 Mich App at 83. That a strategy fails does not mean that its use constitutes ineffective assistance of counsel. *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008). But the failed strategy must, in fact, be sound, and courts must be cautious to not insulate the review of counsel's deficient performance by calling it trial strategy. *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014).

During direct, the victim testified that defendant "touched [her] inappropriately." The prosecutor then asked the victim to tell her about a time that defendant touched her inappropriately. The victim testified that, while she was sleeping in the dining room with her cousins, defendant came into the dining room, picked her up, carried her to his bedroom, put her on the bed on her back, pulled down her pants, and "put his mouth on [her] private area." The victim described how the defendant used his tongue to touch her "private area" that that she uses to "[p]ee." She said that she was uncertain what defendant was doing with his hands at this time. The victim testified that defendant eventually flipped her over and put his hands on her waist, and then she felt his

---

[1] *People v Morgan*, unpublished order of the Court of Appeals, entered October 28, 2020 (Docket No. 351580).

"private part" touching her "private part" that she described earlier.  She said that defendant had clothes on and that she never saw his "private part," but she felt it.

The prosecutor then asked the victim if this "happen[ed] more than that time," and the victim said "[y]es," so the prosecutor asked the victim to describe another time.  The victim then testified that defendant "[s]ometimes" came into the dining room while she was sleeping, and "he would pull down [her] pants and he would put his hands on [her] private area."  She described how she would feel "his fingers around [her] private area" "[i]n the front" where she described earlier.  The victim said that defendant would touch her "private area for awhile [sic]" and then leave.

On cross-examination, defense counsel, in an apparent attempt to impeach the victim, read a series of exchanges from the preliminary examination transcript:

> *Q*.  Do you remember being asked the question:
>
> > "What made you uncomfortable there?"
>
> And you answer:
>
> > "[Defendant] put his hands on me."
>
> Do you remember that question and that answer?
>
> *A*.  Yes.
>
> * * *
>
> *Q*.  And do you remember, after pointing to where he put his hands on you, being asked the question, line 13 through 14, page 19:
>
> > "What do you use that part of your body for?"
>
> And you saying:
>
> > "Using the bathroom."
>
> Do you remember that?
>
> *A*.  Yes.
>
> *Q*.  Okay.  And the question:
>
> > "Using the bathroom, and is that to go pee or to go poop?"
>
> And you said:
>
> > "To go pee."
>
> Is that right?

*A.*  Yes.

\*   \*   \*

*Q.*  "When [defendant] touched you there, was it his hands or something different?"

And you said:

"His hands."

Do you remember giving that answer to that question?

*A.*  Yes.

\*   \*   \*

*Q.*  Now do you also remember talking about another time . . . when [defendant] touched you with his penis.  Do you remember talking about that?

*A.*  Yes.

*Q.*  Okay.  And do you remember being asked the question, line—page 25, line 21:

"Now, when [defendant] touched you with his penis, where the pee comes out, did you have your clothes on?

And you said:

"No."

Is that right?

*A.*  Yes.

*Q.*  And then the next question says:

"Were they off?"

And you said:

"Yes."

Is that correct?

*A.*  Yes.

\*   \*   \*

*Q*. Do you remember being asked the question when you were describing when he touched you with his penis:

"Did any other part of [defendant's] body touch any part of your body?"

And your answer was:

"Yes."

Do you remember that?

*A*. Yes.

*Q*. And do you remember being asked the question:

"What other part of his body touched your body?"

And the answer being:

"His mouth."

Do you remember saying that?

*A*. Yes.]

To any extent that the victim was impeached (if at all) by this reading of the preliminary examination testimony, all of the salient points read by defense counsel only confirmed the victim's trial testimony. At trial, the victim testified about one incident where defendant used his hand to touch her "private area" that she uses to "[p]ee." On cross-examination, defense counsel read an excerpt from the preliminary examination transcript in which the victim testified that defendant touched the area that she uses "[t]o go pee" with "[h]is hands," confirming her trial testimony. At trial, the victim testified about an incident when defendant pulled her pants down, then flipped her on her back and touched her with his penis. On cross, defense counsel read from the preliminary examination transcript an excerpt in which the victim testified that she did not have clothes on when defendant touched her with his penis, again confirming her trial testimony. At trial, the victim testified about how defendant used his mouth to touch her "private area." On cross, defense counsel read an excerpt from the preliminary examination in which the victim was asked if any other part of defendant's body touched her body, and she said his mouth did, once again confirming her trial testimony. In sum, the victim testified at trial that defendant touched her "private part" that she uses to "[p]ee" with his mouth, penis, and hands, and then on cross-examination, defense counsel read excerpts from the preliminary examination in which the victim testified that defendant touched the part of her body that she uses "[t]o go pee" with his mouth, penis, and hands. This cross-examination not only failed to impeach the victim, but confirmed much of her trial testimony.

As previously stated, what questions to ask a witness are matters of trial strategy, and this Court may not "substitute its judgment for that of counsel regarding matters of trial strategy."

*Davis*, 250 Mich App at 368. Certainly, counsel's attempt to impeach the victim was trial strategy. And because this case amounted to a credibility contest with the victim, it was sound trial strategy for defense counsel to try to impeach the victim. Obviously, that strategy failed, but this alone does not mean its use constituted ineffective assistance. *Petri*, 279 Mich App at 412.

Nevertheless, the strategy that defense counsel used to impeach the victim was wholly unreasonable under the circumstances. This was not an instance where defense counsel was taking a calculated risk to win a difficult case—defense counsel knew, or should have known, what was in the preliminary examination transcript before reading it into the record at trial. There was no "risk" involved. And the victim's responses to defense counsel's impeachment attempts were predictable, and presumably what defense counsel expected—the victim confirmed that each passage that defense counsel read from the preliminary examination transcript was what she said in her earlier testimony. Those confirmations, however, did nothing to help defendant because none of what the victim said in her earlier testimony contradicted her trial testimony. In fact, her preliminary examination testimony was consistent with her trial testimony. This should have been obvious to defense counsel because anyone reading the preliminary examination transcript would recognize that the victim's testimony at the preliminary examination was consistent with her trial testimony. Thus, despite that impeaching the victim was a sound trial strategy, defense counsel's use of the preliminary examination transcript to "impeach" the victim was not a sound strategy, and we will not insulate review of counsel's deficient performance by calling it trial strategy. See *Douglas*, 496 Mich at 585. Instead, we conclude that defense counsel's use of the victim's preliminary examination testimony to "impeach" the victim fell below an objective standard of reasonableness because it confirmed—and did not impeach—the victim's trial testimony.

This deficient performance prejudiced defendant such that defendant is entitled to a new trial. This case was a one-on-one credibility contest, which is "not uncommon in criminal sexual conduct cases." *People v Anderson*, 446 Mich 392, 407 n 37; 521 NW2d 538 (1994). The prosecution did not have any physical evidence substantiating the victim's claims, and no one else saw the alleged sexual assaults—the prosecution's case hinged entirely on the credibility of the victim's allegations. In such situations, "defense counsel's success in undermining [the victim's] credibility [is] all the more critical." *Douglas*, 496 Mich at 586. Defense counsel here not only failed to undermine the victim's credibility with his reading of the preliminary examination transcript, but he bolstered it. The victim's testimony from the preliminary examination was consistent with her testimony at trial, demonstrating that her story about defendant's assaults did not change.

This consistency factored into the trial court's reasoning for finding defendant guilty. In explaining its reasoning, the court acknowledged that this case "[e]ssentially . . . comes down to whether or not the Court believes the testimony of [the victim]." It then went through various "questions" it asked itself in deciding whether to believe the victim's testimony. One of those questions was, "Has [the victim's] story been consistent?" In concluding that it had, the court reasoned, "She really wasn't impeached on anything of substance from the preliminary exam, Kids-TALK or the medical records that were admitted." Thus, the trial court at least partially relied on the consistent statements that defense counsel admitted into evidence during cross-examination when finding defendant guilty.

Moreover, this was a close case. The only direct evidence of defendant's crimes was the victim's allegations, and defendant presented numerous pieces of evidence to cast doubt on whether those allegations were worthy of belief. Defendant admitted evidence that his apartment was cluttered and difficult to move around in, and numerous witnesses testified that the floors of the apartment squeaked wherever you walked, making it less likely that defendant could sneak through the house in the middle of the night. The victim also testified that one of the assaults occurred in defendant's bedroom at night while Karen was at work, but both Karen and Henry testified that Karen did not work nights, and Karen testified that she was always home at night. The victim also testified that defendant would assault her by coming into the dining room at night, but Karen testified that it would not have been possible for defendant to get up at night without waking her because of the way they slept—he slept on the side of the bed opposite the door, and there was no room for him to walk around the bed, so he had to crawl over Karen to get to the door. Karen also testified that she always kept an eye on the children when they were over, and that defendant and Henry were never at home alone with the children in 2018. Henry also testified that he never heard anything at night, and only ever saw defendant alone with one child—SB—on Saturday mornings while SB watched cartoons. Defendant also admitted evidence to establish a motive for the victim to lie. Defendant elicited testimony from the victim that she did not like defendant, and from the victim's mother that she too did not like defendant. Defendant also established that he was strict and would often punish the victim for not listening, and that this greatly upset the victim. While the trial court did not credit defendant's arguments that the victim's allegations were implausible and that she had motivations to lie, this was nevertheless a close case.

Given the centrality of the victim's allegations, the lack of evidence beyond her allegations, defendant's strong arguments rebutting the allegations, and the trial court's stated reliance on the fact that the victim's preliminary examination did not impeach her trial testimony, it is reasonably probable that, but for defense counsel's unreasonable decision to admit the victim's preliminary examination testimony that was consistent with her trial testimony, the outcome of defendant's trial may have been different. Accordingly, defendant is entitled to a new trial.

While not dispositive, we also note that defense counsel performed deficiently by failing to object to inadmissible hearsay testimony given by AL. During direct, AL testified that the victim did not like going over to defendant's home, and then the following exchange occurred:

> *Q*. And why was that?
>
> *A*. Because he used to touched [sic] her inappropriately . . . .
>
> *Q*. Okay. Did she tell you that at some point?
>
> *A*. Yes.
>
> *Q*. When she told you that, what was she acting like?
>
> *A*. She was kind of mad.

Both parties agree on appeal that AL's statement was hearsay, and that the only hearsay exception that could apply is MRE 803A—the hearsay exception for a child's statement about

sexual acts. As relevant to this case, that rule requires that the declarant be "under the age of ten when the statement was made[.]" MRE 803A(1). The victim testified that the first person she told was AL, but never said when she disclosed the allegations to AL. On appeal, the prosecution concedes that "[i]t is likely the admittance of [AL's] statement was in error." Yet there is no basis in the record to support such a conclusion—the record is wholly silent on the victim's age when she made her disclosure to AL. It is therefore not possible to determine at this time whether AL's statement was admitted in error.

But even with that being the case, defense counsel performed unreasonably by not objecting to AL's statement. Again, this was a one-on-one credibility contest, so it was critical for defense counsel to undermine the victim's credibility. See *Douglas*, 496 Mich at 586. AL's testimony about what the victim told her was consistent with the victim's testimony, thereby bolstering the victim's credibility. Because there is nothing in the record establishing that the victim was under ten years old when she disclosed the allegations to AL, there is no basis in the record to conclude that AL's statement was admissible under MRE 803A. On this undeveloped record, defense counsel should have objected because there was a possibility that AL's statement was not admissible. AL's statement was harmful to defendant's case, and there was no strategic reason for defense counsel's decision to not contest its admission. Accordingly, defense counsel's decision to not object to AL's statement fell below an objective standard of reasonableness.

It is unclear, however, whether this deficient performance prejudiced defendant. On this record, there is no basis to conclude that AL's statement was, in fact, inadmissible. If it was inadmissible, there is reason to believe that its admission was highly prejudicial to defendant and could have affected the outcome of his trial. See *People v Gursky*, 486 Mich 596, 620-621; 786 NW2d 579 (2010) ("In a trial where the evidence essentially presents a one-on-one credibility contest between the victim and the defendant, hearsay evidence may tip the scales against the defendant, which means that the error is more harmful. This may be even more likely when the hearsay statement was made by a young child, as opposed to an older child or adult.") (Footnotes omitted.) Normally, a *Ginther* hearing on this issue would be necessary to determine whether AL's statement was admissible. However, because we conclude that defendant is entitled to a new trial regardless of whether this statement was admissible, a *Ginther* hearing is not necessary.[2]

Lastly, while not requested by defendant, we remand this case to be retried before a different judge. This case was a bench trial, and the original judge, sitting as the factfinder, found defendant guilty. The appearance of justice would be well-served if the case were retried before a judge who had not previously considered the evidence and adjudged defendant guilty. See *People v Walker*, 504 Mich 267, 285-286; 934 NW2d 727 (2019) (explaining that, when determining whether to reassign a case to a different judge, we must consider "whether reassignment is advisable to preserve the appearance of justice") (quotation marks and citation omitted).

---

[2] Defendant raises several other claims on appeal, but in light of our conclusion that defendant is entitled to a new trial, we decline to address those claims.

## IV. CONCLUSION

Defense counsel's performance fell below an objective standard of reasonableness when it bolstered the victim's testimony by introducing consistent statements from her preliminary examination testimony. This deficient performance prejudiced defendant, so defendant is entitled to a new trial.

Vacated and remanded for a new trial before a different judge. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Jane M. Beckering
/s/ Colleen A. O'Brien