*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHAEL SHAUN LOWREY,

Defendant-Appellant.

FOR PUBLICATION
June 23, 2022
9:05 a.m.

No. 355364
Ogemaw Circuit Court
LC No. 19-005171-FH

Before: RONAYNE KRAUSE, P.J., and M. J. KELLY and YATES, JJ.

PER CURIAM.

A jury found defendant guilty of two counts of third-degree criminal sexual conduct (CSC-III) (sexual penetration accomplished by force or coercion), MCL 750.520d(1)(b). The trial court sentenced defendant to serve concurrent sentences of 115 to 180 months in prison. Defendant appeals by right, raising several issues both through appellate counsel and his Standard 4 brief.[1] We affirm.

## I. BACKGROUND

On March 19, 2019, defendant entered his then-soon-to-be ex-wife's home and raped her. Defendant had a long history of committing domestic violence and sexual abuse against the victim and a former partner. One of the hallmarks of defendant's abuse was to accuse the victim of being unfaithful to him, and this often escalated into physical abuse. The victim filed for divorce on March 14, 2019, and defendant moved out of their home on March 17. On March 19, the victim awoke early in the morning hours to loud noises coming from her front door. She discovered defendant was there with a crowbar and screwdriver and that he had attempted to pry the door open. The victim let defendant into the house after he threatened to break down the door.

---

[1] A "Standard 4" brief refers to a brief filed on behalf of an indigent criminal defendant pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4.

Defendant testified that he brought the crowbar and screwdriver intending to pry the door open if necessary, but he insisted that the victim admitted him before he made any effort to break the door.

Defendant then forcefully moved the victim to the bedroom, blocked her path to escape, and pushed her onto the bed. Defendant began removing the victim's clothes, and the victim made clear to defendant that she did not want to engage in any sexual activities, including shaking her head to avoid having to kiss him and telling him "that he couldn't do this." Defendant told her that "I can do what the fuck I want because you're my wife." Defendant removed the victim's clothes, while she told him "no" and that she "was on [her] period." Defendant forced himself upon her and began having vaginal intercourse with her. At that time, he ripped off a necklace that the victim was wearing that said "Mom," telling the victim that she did not deserve it. After some time, defendant stopped, went to a closet, returned with a dildo and told the victim that if she "wanted to be a whore" that she was "gonna feel what it's like to be fucked by two men at once." Defendant inserted the dildo into the victim's anus and his penis into her vagina. The victim testified that she was scared for her life and believed that, if she had resisted, she "could've lost [her] life that night."

After raping the victim, defendant eventually fell asleep, and the victim was able to escape and contact police, who arrived and arrested defendant. Defendant made several incriminating statements to police in an interview, and he was charged with two counts of CSC-III. Prior to trial, the prosecution filed notice of its intent to introduce evidence of defendant's prior domestic violence and sexual assault against the victim and another woman from a prior relationship. Relevant to this appeal, the prosecution gave notice of only one incident between defendant and the victim that occurred in 2018. However, at trial, the prosecution sought to elicit testimony from the victim about ongoing abuse in addition to the 2018 incident. Defendant objected based on lack of prior notice, but the trial court overruled the objection and admitted the testimony.

Detective Lieutenant Timothy Heliin, with the Michigan State Police, interviewed defendant after his arrest. Detective Heliin had training in various interview techniques. He testified about his approach to the interview and how he used multiple different techniques because "if you use one technique, you could stereotype a person into it" so he would "give that person the benefit of the doubt and use each technique to make a better assessment." Regarding the interview with defendant, Detective Heliin testified:

> After I made my assessment that I didn't believe Mr. Lowrey was being a hundred percent truthful with me, the initial assessment, the initial story that he had given me was:
>
> He was married to a – a woman named [the victim]. At which time she had served him divorce papers recently, which he – which was out of the blue for him. He stated he wished to talk to [the victim], and throughout the day that they had texted and communicated. And he went over, they had a conversation, they worked it all out, and had consensual sex in the – in the bedroom of [the victim's] residence. At which time, early morning hours, he was awoken by deputies or law enforcement.

I confronted him that I didn't believe that he was being a hundred percent truthful with me through that entire process. I stated, "If we were closer to what [the victim] had stated to the investigators originally, did you actually mean to hurt her?" And he stated, "No." So these are theories that I'll put out or hypothesis that I will put out on why somebody is not being a – a completely truthful [sic] with me.

Throughout that I also stated if it was the divorce, if it was the alcohol he had consumed, the stress of possibly losing his house, whatever he felt the relationship with his son, could that also contribute to what actually happened? He said, "Yes[.]" And I actually asked, "Am I on track? Am I – am I being correct here? Am I interpreting you correctly?" And he stated, "Yes, you're – you're on track."

It went there and we talked more, and I asked if "You actually went there and you were more angry, more ramped up than what you had led me to believe, did you push it – push it, the envelope, just a little too far?" And he said, "Yeah. Yeah. You're right."

So he would confirm that these hypothesis [sic] that I was providing to him. A truthful person will automatically reject those hypothesis [sic].

Defendant objected on the basis that Detective Heliin could not "testify what a truthful person can do or will do" and that "he's . . . standing here and basically being a human polygraph machine, if he's gonna say I believe he's lying." The trial court responded by telling defendant "Well, I don't think that's what he said" and "That's not what he—that's not what he said." It then confirmed with Detective Heliin that Detective Heliin had been "probing [defendant] with different hypotheses that he was then responding to" and had "been taught as part of [his] training, that an individual that is not being deceptive, will respond a certain way to those hypotheses." The trial court then overruled the objection, reasoning that "I think that's part of his training. He's not saying he's lying. But that's part of his training and his opinion."

Detective Heliin then testified as to the rest of the four-and-a-half-hour interview, some of the specific questions he asked defendant, and how defendant ultimately admitted to intending to use the crowbar and screwdriver to open the door and "get that sex no matter what." Detective Heliin also noted that, among other things, he asked defendant questions that had not been alleged, like whether defendant had dragged the victim by the hair, which defendant denied. Detective Heliin explained that this was another hypothesis test, because "somebody that is just going along with what I'm saying" would "actually say 'yes' to that" despite knowing it to be incorrect.

Defendant testified on his own behalf and generally maintained that he went to the victim's residence in an effort to fix their marriage, and they had consensual sex in the bedroom. The jury convicted defendant on both counts. Defendant now appeals. Through his appellate counsel, he challenges the admission of other-acts evidence without prior notice, Detective Heliin's testimony, and the scoring of OV 7. Defendant, through his Standard 4 brief, challenges the sufficiency of the evidence for his convictions as well as the accuracy of the trial transcripts.

## II. ADMISSION OF EVIDENCE

Defendant argues that the trial court committed several evidentiary errors that require reversal. Specifically, he argues that the trial court erred in admitting Detective Heliin's opinion about defendant's truthfulness, in admitting the victim's testimony regarding prior acts of domestic abuse and sexual assault committed by defendant, and in admitting certain evidence regarding defendant's prior conduct toward the victim's pet pig. Defendant also argues that the cumulative effect of these errors deprived him of a fair trial. We agree that Detective Heliin's testimony and the testimony regarding the pig were erroneous, but we conclude that the errors were not outcome-determinative and did not deprive defendant of a fair trial.

## A. STANDARD OF REVIEW AND PRINCIPLES OF LAW

The trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo; it is necessarily an abuse of discretion to admit legally inadmissible evidence. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). "As a general rule, issues that are not properly raised before a trial court cannot be raised on appeal absent compelling or extraordinary circumstances." *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994). An objection to the admission of evidence must further specify "the specific ground of objection, if the specific ground was not apparent from the context." MRE 103(a)(1). Unpreserved evidentiary issues are reviewed for plain error affecting substantial rights, meaning "three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). A defendant must, in relevant part, show that the error affected the outcome of the proceedings or intrinsically undermined the fairness, integrity, or public reputation of the proceedings. *Id*. at 763-764.

A witness may not comment on, or vouch for, the credibility of another witness. *People v Thorpe*, 504 Mich 230, 264-266; 934 NW2d 693 (2019). Such conduct "invade[s] the province of the jury to determine" issues in a case. *Id*. at 264-265. Furthermore, "[a] witness may not opine about the defendant's guilt or innocence in a criminal case." *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). Nevertheless, a police officer may testify about his or her perceptions, during the course of an investigation, of whether a defendant was being truthful. See *id*. at 82-83.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "In this context, prejudice means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion." *People v Vasher*, 449 Mich 494, 501; 537 NW2d 168 (1995). Rather, "[u]nfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

## B. DETECTIVE HELIIN'S TESTIMONY

Defendant first argues that the trial court erred by admitting Detective Heliin's testimony about his truthfulness during the interview. Defendant maintains that Detective Heliin improperly commented on his credibility and ultimate guilt. Defendant objected on the ground that Detective Heliin could not testify as "a human polygraph machine" or whether defendant was being truthful. However, defendant did not object on the ground that Detective Heliin improperly vouched for credibility or ultimate guilt. Affording defendant the benefit of the doubt, we nevertheless construe these objections as entirely preserved, because defendant's vouching argument is arguably "apparent from the context." MRE 103(a)(1); *Grant*, 445 Mich 545-546. Alternatively, defendant contends that the testimony was irrelevant and that, even if relevant, it was substantially more prejudicial than probative. Defendant also argues that Detective Heliin's use or description of certain interviewing techniques presumptively requires a retrial. Defendant did not object on the basis of relevance, improper prejudice, or the use or description of particular interviewing techniques, so these objections are unpreserved. *Id*. We agree that Detective Heliin's testimony was erroneous in several respects, but we are unable to find the errors outcome-determinative.

As an initial matter, Detective Heliin's testimony was clearly relevant. Pursuant to MRE 401, relevant evidence

> means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Relevant evidence is admissible unless otherwise prohibited, and irrelevant evidence is not admissible. MRE 402. Defendant's incriminating concessions during the interview had a significant tendency to make facts at issue more probable. Furthermore, it was important for the jury to understand the nature of Detective Heliin's interviewing techniques, including why Detective Heliin asked some of the questions and to give context to defendant's answers.

Conversely, Detective Heliin unambiguously expressed the opinion that defendant was lying to him. For example, Detective Heliin testified that at the end of the interview, he told defendant that he still did not believe defendant was being entirely truthful, whereupon defendant became aggressive. Upon being asked what caused defendant to become aggressive, Detective Heliin testified,

> I think there's only one person that could actually answer that and that would be Mr. Lowrey, but my opinion would be that he finally realized that I was not gonna listen to his lies anymore and he had to face what he actually did.

Furthermore, Detective Heliin cloaked his opinion in a veneer of artificial credibility by citing certain interviewing techniques, including the "Reid Interview and Interrogation Method" and the

"PEACE Model."[2] Strictly speaking, Detective Heliin never stated that he believed defendant actually committed the crime of CSC-III, and he did not directly comment on defendant's testimony at trial.

As an initial matter, it is not entirely forbidden for a police officer to express the belief that a statement made by a defendant during the course of an investigation was untrue. In *Heft*, an interviewing police officer opined that, because certain statements made by the defendant struck him as unreasonable, the officer "didn't think that [the defendant] was being truthful." *Heft*, 299 Mich App at 82. This Court held that "a fair reading of the officers' testimony reveals that they did not opine about [the defendant's] guilt but, instead, were explaining the steps of their investigations from their personal perceptions." *Id*. at 83. Conversely, it has long been established that expert witnesses may not comment on the truthfulness of a defendant's confession or vouch for the veracity of a victim. *People v Kowalski*, 492 Mich 106, 129; 821 NW2d 14 (2012); *People v Hamilton*, 163 Mich App 661, 668-669; 415 NW2d 653 (1987).

On the basis of *Heft*, we think it permissible for an interviewing officer to recount what he or she told an interviewee, including a statement of disbelief. Leaving aside whether doing so is a fair interviewing technique,[3] such a prohibition would likely make it prohibitively difficult to testify about how an interview was conducted. However, there is a subtle yet important distinction between testifying that "I told him I did not believe him as part of an interviewing technique," versus testifying that "I believe he was lying on the basis of my experience and training." The latter clearly violates the prohibition against experts commenting on the truthfulness of a defendant's confession. Notably, although Detective Heliin was not qualified as an expert witness, even after the prosecutor attempted to "clear up" his testimony by getting Detective Heliin "admitted as an expert", his discourse regarding his interviewing techniques effectively cast him as one. Indeed, after attempting to have Detective Heliin admitted as an expert, the prosecutor stressed how Detective Heliin's conclusions were all based on an ostensibly scientific method. As a consequence, Detective Heliin's testimony clearly strayed beyond the bounds of permissibility.

Despite our concerns, we cannot conclude that Detective Heliin's testimony was improper in its entirety or that the errors in his testimony were outcome-determinative. Detective Heliin was clearly permitted to describe the steps he took in his investigation, as well as at least some of his thought processes and the bare fact that he *told* defendant that he did not believe defendant. Detective Heliin did not specify exactly which statements he believed were untruthful, and his testimony implies that he did not believe defendant was being untruthful about everything. Detective Heliin did not express the belief that defendant committed CSC-III, or, for that matter, any particular acts. Detective Heliin also mitigated the harmful nature of his testimony by pointing out that the techniques were just techniques and that every person was different. Finally, we are

---

[2] Defendant asserts that "the 'Reid Technique' " is "a guilt-presumptive, accusatory mechanism of interrogation. Thus, retrial is warranted here." We decline to express any opinion as to the usefulness or propriety, in the abstract, of the Reid Technique or any of the other training received by Detective Heliin, and we believe their permissibility is a matter better directed to the Legislature. Our concern is instead with the effect of Detective Heliin's testimony upon the jury.

[3] See footnote 2.

not unmindful of the fact that Detective Heliin's general disbelief of defendant was intrinsically implied from the nature of the proceedings; although this does not excuse the impropriety, it does blunt any ensuing prejudice. *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007).

Significantly, evidentiary errors must be evaluated "in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). We must therefore examine "the entire cause." *Id*. at 495-496. As was the case in *Lukity*, defendant's convictions here did not rest solely on a simple credibility contest. The police interview itself was played for the jury, at which defendant made seriously incriminating admissions. Defendant's own shifting version of events at that interview served as an effective admission that he had not, in fact, been entirely truthful with Detective Heliin, and his incriminating statements stood alone from Detective Heliin's improper credibility assessment. Defendant also testified on his own behalf, allowing the jury its own opportunity to evaluate defendant's credibility, and Detective Heliin did not comment on that testimony. Defendant was also determined—by his own admission—to be in possession of tools to break into the victim's home, and a responding police officer opined that there were fresh pry-marks on the door. Furthermore, there was nothing intrinsically implausible about the victim's testimony, which the jury was entitled to believe. Ultimately, we conclude that defendant's own admissions, along with the other evidence admitted at trial, are sufficient to establish that the errors in Detective Heliin's testimony were not, in this particular case, outcome-determinative.

Finally, defendant challenges Detective Heliin's testimony under MRE 403, which provides:

> evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We agree with defendant that a witness's opinion of another witness's credibility has no probative value, but such an opinion is not necessarily unfairly prejudicial. *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985). As discussed, notwithstanding the errors in Detective Heliin's testimony, it was not improper in its entirety. Furthermore, the bulk of the prejudice to defendant came from his own statements. The fact that defendant's interview was damaging to his case is not a basis for exclusion under MRE 403. Defendant has not established plain error.

## C. OTHER-ACTS EVIDENCE

Next, defendant argues that the trial court erred by admitting evidence of prior domestic and sexual abuse between himself and the victim because of lack of notice. Alternatively, he contends that the testimony was irrelevant pursuant to MRE 402 and that, even if relevant, it ran afoul of MRE 403. He advances the same arguments concerning testimony by the victim of her pet pig. At trial, defendant timely objected to evidence of the pig on the basis of relevancy only, so his other arguments concerning the pig are unpreserved. MRE 103(a)(1); *Grant*, 445 Mich 545-546. We discern no error except for the admission of the pig evidence. However, because we find that error harmless, defendant is not entitled to relief.

Under MCL 768.27b(1), the prosecution may offer evidence of other acts of prior domestic violence or sexual assault by a defendant when the defendant is charged with domestic violence or sexual assault. MCL 768.27b(2) provides:

> If the prosecuting attorney intends to offer evidence under this section, the prosecuting attorney shall disclose the evidence, including the statements of witnesses or a summary of the substance of any testimony that is expected to be offered, to the defendant not less than 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown.

MRE 404(b)(2) has a similar notice requirement:

> The prosecution in a criminal case shall provide written notice at least 14 days in advance of trial, or orally on the record later if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale, whether or not mentioned in subparagraph (b)(1), for admitting the evidence. If necessary to a determination of the admissibility of the evidence under this rule, the defendant shall be required to state the theory or theories of defense, limited only by the defendant's privilege against self-incrimination.

The prosecution does not dispute that it failed to give prior notice to defendant for either the additional abuse testimony or the pig evidence.

Nevertheless, although failure to provide notice constitutes plain error, it may be deemed harmless and therefore not grounds for reversal. *People v Hawkins*, 245 Mich App 439, 453-455; 628 NW2d 105 (2001). This Court stated that the purpose of the notice was threefold:

> (1) to force the prosecutor to identify and seek admission only of prior bad acts evidence that passes the relevancy threshold, (2) to ensure that the defendant has an opportunity to object to and defend against this sort of evidence, and (3) to facilitate a thoughtful ruling by the trial court that either admits or excludes this evidence and is grounded in an adequate record. [*Id*. at 454-455.]

This Court held that, because the additional other-acts evidence was relevant and not outweighed by unfair prejudice, and the defendant "never suggested how he would have reacted differently to this evidence had the prosecutor given notice," "notice to [the defendant] would *not have had any effect* on whether the trial court should have admitted it at trial, regardless of the record or arguments that could have been developed and articulated following notice." *Id*. at 455-456 (emphasis added). Accordingly, "this case does not invoke the Supreme Court's concern that, without notice, the prosecutor was able to use irrelevant, inadmissible prior bad acts evidence to secure [the defendant's] conviction." *Id*.

*Hawkins* is analogous to the present case and precludes relief for defendant. The victim testified that "[w]hen [defendant] was to drink [sic], and it was only when he'd drink, he would pull my hair, push me, grab me by my arm, verbally abuse me. He's choked me." She testified that this happened approximately two to three times each week. When asked why she did not call the police, the victim explained that she "felt like . . . it'd a been [sic] worse if I did." Later in the

trial, after the victim described the present offenses, she was asked, "And did you ever try to say no to the defendant before in regards to sex?" She replied that she had tried to say "no," but that it did not stop defendant because "[h]e didn't take no for an answer." Although notice was not given, this testimony was clearly relevant and admissible under MCL 768.27b(1), was highly probative, and was not outweighed by unfair prejudice. It showed defendant's pattern of prior abuse toward the victim, that he did not take "no" for an answer, and that the victim felt that she could not resist on the night in question.

Defendant argues that if notice had been properly provided, "trial counsel would have likely prepared Mr. Lowrey differently regarding his testimony, and certainly would have had time to adequately look into these alleged prior unreported acts of domestic violence and sexual misconduct." However, as was the situation in *Hawkins*, defendant fails to articulate *how* he would have proceeded differently, nor has he provided any offer of proof to the effect that the victim's testimony was untrue.

The victim also testified that she asked police for her pet pig because she was afraid that defendant would hurt the pig; the victim explained that defendant regularly physically abused the pig because it did not like him. As discussed, it was plain error for this evidence to be admitted without providing proper notice. However, we disagree with defendant that the evidence was irrelevant: it showed the victim's state of mind at the time of the sexual assault, and it further illustrated defendant's history of abusing and controlling the victim. Furthermore, we are unpersuaded that the probative value of this evidence was *substantially* outweighed by the danger of unfair prejudice. The pig testimony was a very small portion of testimony and occupied only a few questions. Furthermore, there was overwhelming evidence against defendant, including the victim's testimony, physical evidence, and defendant's incriminating statements made to Detective Heliin. Defendant has failed to demonstrate that any error was outcome-determinative, and he is therefore not entitled to relief.[4]

## D. CUMULATIVE ERRORS

Defendant contends that the cumulative errors deprived him of a fair trial and warrant a new trial. We disagree.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v Gaines*, 306 Mich App 289, 321-322; 856 NW2d 222 (2014). However, each of the errors must be of some consequence. *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). We agree with defendant that there were serious errors in Detective Heliin's testimony, albeit not of sufficient prejudice to warrant reversal. We also agree that the admission

---

[4] Within this issue, defendant argues that MCL 768.27b is unconstitutional because it is fundamentally unfair and violates due process. However, defendant failed to raise this in his statement of questions presented. Therefore, this issue is not "properly presented" before this Court, and "he has waived this issue for appellate review." *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011).

of the pig evidence was erroneous, but we find that error essentially trivial. Where there is only one error of consequence that does not individually warrant a new trial, a new trial is not warranted on the basis of cumulative error. See *Gaines*, 306 Mich App at 322. As discussed, there was sufficient properly-admitted evidence that we are unable to find defendant entitled to a new trial.

### III. OFFENSE VARIABLE 7

Defendant contends that the trial court clearly erred by assigning 50 points to OV 7. We disagree.

A trial court's findings relevant to scoring of the guidelines "are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

OV 7 is for "aggravated physical abuse." MCL 777.37(1). OV 7 is to be scored at 50 points if the "victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). Otherwise, the variable is to be scored at zero points. MCL 777.37(1)(b). "Sadism" is defined as "conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification." MCL 777.37(2). This Court has previously stated that "OV 7 is designed to respond to particularly heinous instances in which the criminal acted to increase [a victim's] fear by a substantial or considerable amount." *People v Rodriguez*, 327 Mich App 573, 578; 935 NW2d 51 (2019) (quotation marks and citations omitted; alteration in original). The conduct must have occurred during the offense, and a trial court may not look to outside conduct. *Id*. The conduct must have been "beyond the minimum required to commit the offense." *Id*. at 579 (quotation marks and citation omitted).

In order to be convicted of CSC-III (sexual penetration accomplished by force or coercion), a person must "engage[] in sexual penetration with another person and," relevant to this appeal, "[f]orce or coercion is used to accomplish the sexual penetration." MCL 750.520d(1)(b). These are the minimum requirements. These requirements were met by defendant forcing himself on the victim and sexually penetrating her vagina with his penis. However, defendant went beyond these minimum requirements by verbally abusing her and subjecting her to extreme and humiliating conduct to make her suffer for his own gratification. The victim testified that, during the sexual intercourse, he ripped off her necklace, which said "Mom," and told her she "didn't deserve that, and it made [her] cry more." He verbally abused her, and he forced himself upon her while she was on her menstrual period; notably, the victim testified that she had endometriosis, which made sexual intercourse exceptionally painful during her period, and she indicated defendant knew that. Defendant stopped the assault, went to a closet, returned with a dildo, and told the victim that if she "wanted to be a whore" that she was "gonna feel what it's like to be fucked by two men at once." The victim testified that she and defendant had never before engaged in anal sex, let alone anal sex with a dildo while also having vaginal intercourse. The victim testified that she was scared for her life and believed defendant was going to kill her. In light of this evidence, we cannot

conclude that the trial court clearly erred by determining that defendant's actions constituted sadism for purposes of OV 7.

## IV. SUFFICIENCY OF THE EVIDENCE

In his Standard 4 brief, defendant argues that there was insufficient evidence to support his convictions because the victim lied about his attempts to force entry to the home. We disagree.

A claim of insufficient evidence is reviewed de novo. *People v Solmonson*, 261 Mich App 657, 661; 683 NW2d 761 (2004). All "factual conflicts are to be viewed in a light favorable to the prosecution." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748, amended 441 Mich 1201 (1992). The appellate court must "view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Id*.

Defendant's argument is not entirely clear. He appears to believe it significant that he never actually used the crowbar and screwdriver to gain entry to the victim's residence. Defendant further appears to believe the victim committed perjury in testifying that he attempted to force entry. However, defendant fully admitted in his own testimony that he showed up to the victim's residence with the crowbar and screwdriver with the intent of prying the door open.[5] The victim testified that she saw defendant *attempting* to pry it open and that defendant threatened to break the door open, but that she opened the door in response, so defendant did not *actually* break the door open. We find nothing inconsistent about the victim's testimony, and the fact that defendant recounted a different version of events does not establish that the victim committed perjury. Differing versions of events merely establish that "it is for the jury to determine witness credibility and resolve inconsistencies of testimony." *People v Harverson*, 291 Mich App 171, 179; 804 NW2d 757 (2010).

In any event, whether defendant forced the door open is irrelevant to the elements of the charged offenses and, therefore, irrelevant to the sufficiency of the evidence. A conviction for CSC-III requires force or coercion "used to accomplish the sexual penetration." MCL 750.520d(1)(b). None of the essential elements of CSC-III turn on whether defendant used force, or tried or intended to use force, to gain entry to the victim's residence. As previously discussed, there was ample evidence to support the jury's verdict, and defendant offers no other argument for why there was insufficient evidence.

## V. ACCURACY OF TRANSCRIPT

Finally, defendant in his Standard 4 brief argues that the trial transcript is inaccurate and entitles him to relief. We disagree.

Certified records of trial proceedings are presumed to be accurate, but the presumption is rebuttable. *People v Abdella*, 200 Mich App 473, 475; 505 NW2d 18 (1993). "Where a defendant

---

[5] We note that defendant insisted he did not intend to use the crowbar and screwdriver to hurt anybody, but he admitted nobody had accused him of having such designs.

is able to make a colorable showing that inaccuracies in transcription have adversely affected the ability to secure postconviction relief, and such matters have seasonably been brought to the trial court's attention, the defendant is entitled to a remedy." *Id.* at 475-476. Defendant must:

> satisfy the following requirements: (1) seasonably seek relief; (2) assert with specificity the alleged inaccuracy; (3) provide some independent corroboration of the asserted inaccuracy; (4) describe how the claimed inaccuracy in transcription has adversely affected the ability to secure postconviction relief pursuant to subchapters 7.200 and 7.300 of our court rules. [*Abdella*, 200 Mich App at 476.]

A nonexhaustive list of ways to satisfy the third element might:

> include affidavits of witnesses, trial spectators, police officers, court personnel, or attorneys; references to police reports or preliminary examination transcripts, or perhaps to trial circumstances that demonstrate the position of the petitioner, such as noting that if the witness whose testimony is claimed to have been transcribed inaccurately had actually testified as transcribed, then the final arguments would have been different. [*Id.* at 476 n 2.]

Defendant has met the first two elements to overcome the presumption of transcript accuracy, but he has failed to demonstrate independent corroboration of the asserted inaccuracy.

Defendant contends that the transcript does not accurately reflect that, at some point during his cross-examination, the prosecutor asked him "does 'no' mean 'go,' " and defendant answered in the negative. At sentencing, defendant advised the trial court that he believed he had been "asked if I understood if no means no, and I said 'No' . . . because I thought [the prosecutor] asked if I knew if no means go, as in to leave or to go." Defendant also mentioned that he and several other witnesses had difficulty hearing questions through the protective barriers that had been erected in light of the COVID-19 crisis. Other witnesses did, in fact, apparently have difficulty hearing some questions. It is certainly plausible that defendant might have misheard a question and given an incorrect answer on that basis. Nevertheless, we agree with defendant that the transcript of his cross-examination does not reflect *either* question being asked of him.

Defendant admits that "he has no independent corroboration to help substantiate his claim" that the transcript was inaccurate. However, he notes that the prosecution, during closing argument, asserted that defendant "does not understand the word no." Defendant takes that as necessarily a reference to having been asked "does 'no' mean 'go.' " We disagree. The prosecutor's statement was merely a theme that the prosecution returned to throughout the trial. The victim testified that defendant did not take "no" for an answer in regard to sex, and Detective Heliin testified that defendant admitted to having planned to "get that sex no matter what." Furthermore, the transcript does show that the prosecutor asked defendant whether a person could indicate that they did not want sex without literally saying "no," in response to which defendant's answers could reasonably be deemed somewhat evasive. In short, the prosecutor's argument was

-12-

fairly based on the evidence reflected in the transcript.  Defendant has not shown that the transcript was erroneous.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Michael J. Kelly
/s/ Christopher P. Yates